# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**PENNSYLVANIA INSTITUTIONAL
LAW PROJECT
By: Angus R. Love, Esquire
Identification No. 22392
Suite 523, 924 Cherry Street
Philadelphia, PA 19107
Telephone: (215) 925-2966
Facsimile : (215) 925-5337**

**Attorney for Plaintiff**

Stratton Neal Peay,

       Plaintiff,

  vs.

Superintendent Donald Vaughn, Julie
Knauer, Ralph W. Smith, Sergeant Thomas,
and Correctional Health Care, Inc.,

           Defendant(s).

: CIVIL ACTION
:
:
:
: NO. 02-2688
:
:
:
:
:
:
:

## AMENDED COMPLAINT

**I.   Preliminary Statement**

   1.  This is a civil rights action filed pursuant to 42 U.S.C. §1983 by Stratton Neal

Peay, a State prisoner, alleging cruel and unusual punishment, due process of law and

denial of access to the courts.

**II.   Jurisdiction**

   2.  The Court has jurisdiction over the Plaintiff's claim of violations of federal

constitutional rights under 42 U.S.C. §§1331(a) and 1343.



III.    **Exhaustion of Administrative Remedies**

3.  There is a grievance procedure available at the institution where Plaintiff was incarcerated during the relevant time period.

4.  Plaintiff filed grievances relating to this Complaint and completed the process to the greatest extent possible.

IV    **Parties**

5.  Plaintiff Stratton Neal Peay is an inmate incarcerated at the State Correctional Institute at Graterford at all times relevant to this Complaint.

6.  At all times relevant to the allegations in this Complaint, Defendants were acting under color of state law.

7.  Defendant Donald Vaughn is the Superintendent of the State Correctional Institute at Graterford (S.C.I.G.), Pennsylvania.

8.  Defendant Julie Knauer is a health care administrator at S.C.I.G.

9.  Defendant Dr. Ralph W. Smith is a physician employed at S.C.I.G.

10. Defendant Sergeant Thomas is a correctional officer at S.C.I.G.

11. Defendant Correctional Health Care, Inc. is a for-profit corporation that contracts with the Pennsylvania Department of Corrections to provide health care to inmates housed at S.C.I.G.

12. All defendants are sued in their individual and official capacities.

V.    **Facts**

13. Plaintiff Peay was incarcerated at the State Correctional Institute at Graterford in 1998.

14. Shortly before August 2001 Plaintiff was housed in cell B-217 on B Block at S.C.I.G.

15. Plaintiff Peay complained to Sergeant Thomas that he felt threatened by his cellmate S. Sanders and wanted to move to another cell or have Sanders moved to another cell.

16. Plaintiff Peay repeatedly requested a separation to Sergeant Thomas but was ignored.

17. On or about August 2001, Plaintiff was drugged and sexually assaulted by Sanders.

18. Plaintiff Peay reported the sexual assault to Defendant Vaughn and to Defendant Dr. Smith and requested an investigation.

19. No investigation took place.

20. Shortly thereafter Plaintiff Peay began to experience abdomen problems including a bleeding rectum, constipation, stomach pain and nausea.

21. Plaintiff Peay repeatedly requested treatment for these problems but was denied by Defendant Dr. Smith and Defendant Julie Knauer.

22. In November 2001 Plaintiff Peay was removed to the Restricted Housing Unit (RHU) for disciplinary reasons.

23. Plaintiff Peay was released from the RHU in March 2002 but returned in June 2002 also for disciplinary reasons.

24. Due to additional disciplinary problems, he is scheduled to remain in the RHU until 2006.

25. Prior to and during his placement in the RHU, Plaintiff suffers from mental anguish and has had suicidal thoughts.

26. Plaintiff Peay has not received adequate treatment for his mental problems but instead has received continual misconduct reports and additional RHU time.

27. Defendant Correctional Health Care has failed to properly treat his abdomen problems and mental health issues.

28. Plaintiff Peay has filed at least seven (7) grievances related to these issues. (8-23-01, #2350; 11-24-01, #8450; 1-15-02, #12161; 4-13-02, #14579; 7-16-02, #25672; 8-14-02, #28134; 8-15-02, no number; 9-19-02, #31199).

## VI.    **Causes of Action**

29. Plaintiff incorporates by reference paragraphs 1 through 28 above as if fully set forth herein for all causes of action.

30. Defendant Sergeant Thomas's failure to take reasonable steps to protect Plaintiff Peay after being notified of a potential danger from cellmate Sanders constitutes a failure to protect Plaintiff 's safety in violation of the Eighth Amendment to the United States Constitution..

31. Defendants Dr. Smith's, Correctional Health Care , Inc.'s, and Julie Knauer's deliberate indifference to the abdominal problems constitutes a violation of Plaintiff's Eighth Amendment rights under the United States Constitution.

32. Defendants Knauer's, Correctional Health Care, Inc.'s, and Smith's deliberate indifference to Plaintiff's mental health needs constitutes an Eighth Amendment violation to the United States Constitution.

4

33. Defendants Vaughn's, Knauer's and Smith's actions placing Plaintiff Peay in the Restricted Housing Unit despite medical and mental health needs constitute a violation of his Due Process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

34. Defendants Smith's, Knauer's and Vaughn's failure to properly investigate and treat allegations of sexual assault constitutes deliberate indifference to a severe medical need in violation of the Eighth Amendment to the United States Constitution.

35. Defendant Vaughn's placement of Plaintiff Peay in the RHU until 2006 in retaliation for seeking redress of grievances in the courts is a violation of his First Amendment rights to access the courts without retaliation.

## VII.    Damages

36. Plaintiff Peay seeks declaratory relief.

37. Plaintiff Peay seeks compensatory damages against all Defendants.

38. Plaintiff Peay seeks punitive damages against all Defendants.

39. Plaintiff Peay seeks reasonable attorneys fees.

40. Plaintiff Peay seeks any other relief this Honorable Court deems appropriate.

Respectfully submitted,

**PENNSYLVANIA INSTITUTIONAL LAW PROJECT**

BY:

ANGUS R. LOVE, #22392

924 Cherry Street, Suite 523
Philadelphia, PA 19107
Phone: (215) 925-2966
Fax:    (215) 925-5337
Attorney for Plaintiff

Date: January 30, 2003

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of *January* 2003, Plaintiff's Amended Complaint

served via U. S. Mail, first class, postage paid on counsel for Defendants as follows:

Sean Robbins, Esquire
Manor Professional Building
7837 Old York Road
Elkins Park, PA 19027

Edward Wright, Esquire
Deputy Attorney General
Office of Attorney General
21 South Twelfth Street, Third Floor
Philadelphia, PA 19107-3603

ANGUS LOVE

**AFFIDAVIT**

I, Stratton Neal Peay, being duly sworn depose and state that the facts set forth in the foregoing Amended Complaint are true and correct to the best of my knowledge and belief.

Stratton Neal Peay
Stratton Neal Peay

**Sworn to and subscribed before me this 24th Day of January 2003.**

Tanya L. Smith
**NOTARY PUBLIC**

**My Commission Expires:**

NOTARIAL SEAL
TANYA L. SMITH, Notary Public
City of Philadelphia, Phila. County
My Commission Expires October 16, 2004



**POLICY STATEMENT**
Commonwealth of Pennsylvania ● Department of Corrections

| Policy Subject: Consolidated Inmate Grievance Review System | Policy Number: DC-ADM 804 |
|---|---|
| Date of Issue: July 20, 1994 | Authority: Joseph D. Lehman Commissioner | Effective Date: Oct. 20, 1994 |

## I. AUTHORITY

The Authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. PURPOSE

It is the purpose of this Administrative Directive to establish policy regarding the Consolidated Inmate Grievance Review System and to ensure that inmates have an avenue through which resolution of specific problems can be sought.

This directive sets forth procedures for the review of Inmate Grievances not already covered by other Administrative Directives and policies. It also provides the method through which review procedures established by other directives are to be integrated with the procedures outlined in this directive.

## III. APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV. DEFINITIONS

### A. Grievance -

The formal written expression of a complaint submitted by an inmate related to a problem encountered during the course of his/her confinement.

### B. Grievance Coordinator -

The Corrections Superintendent's Assistant in an institution or the Assistant to the Regional Director in Community Corrections who is responsible for the overall administration of the Inmate Grievance System in that facility\region. This includes all data collection, tracking and statistical reporting. At the direction of the Facility Manager or Community Corrections Regional Director, the Grievance Coordinator may be called upon to provide Initial Review of certain grievances.

804-1



C. Grievance Officer -

An appropriate Department Head or Management Level staff person designated by the Facility Manager or CC Regional Director to provide Initial Review of an inmate grievance arising from his/her specific area of responsibility, e.g., a Unit Manager would be assigned to provide Initial Review of a grievance from the housing unit. If the grievance arises from the Food Services Area, the Grievance Officer designated by the Facility Manager shall be the Food Services Manager. Likewise, the Corrections Health Care Administrator would be the Grievance Officer for a grievance related to a Health Care issue.

D. Central Office Review Committee (CORC) -

A committee of at least three (3) Central Office staff appointed by the Commissioner of Corrections to include the Commissioner, Executive Deputy Commissioner and Chief Counsel or their designees.

With the exception of appeals from disciplinary action under DC-ADM 801 and appeals arising from Health Care or medical treatment grievances, the CORC Shall have responsibility for direct review of all Inmate Appeals for Final Review.

E. Central Office Medical Review Committee (COMRC) -

A committee appointed by the Commissioner to include the Director of the Bureau of Health Services and relevant Bureau staff. The COMRC shall have responsibility for direct review of grievance appeals related to Health Care and medical treatment issues.

F. Initial Review -

The first step in the formal Inmate Grievance Process for all issues except those already governed by other specified procedures (see VI E). All reviews conducted below the level of Facility Manager or Regional Director are considered initial reviews.

G. Appeal from Initial Review -

The first level of appeal of a decision rendered at Initial Review. This appeal is directed to the Facility Manager or Community Corrections Regional Director.

An appeal of the Initial Review decision on a grievance related to a Health Care or Medical Issue shall be submitted directly to the COMRC at Central Office.

Only issues raised at Initial Review shall be appealed.

H. Final Review -

Upon completion of Initial Review and appeal from Initial Review, an inmate may seek Final Review from the Central Office Review Committee (CORC), for any issue involving continued non-compliance with Department of Corrections directives or policy, the ICU Consent Decree or other law.

V. POLICY

A. It is the policy of the Pennsylvania Department of Corrections that every individual committed to its custody shall have access to a formal procedure - the Consolidated Inmate Grievance Review System - through which the resolution of problems or other issues of concern arising during the course of confinement may be sought. For every such issue there shall be a forum for review and an avenue of appeal, but only one.

B.  **Informal Resolution of Problems** - All inmates are expected to attempt to resolve problems or differences with staff on an informal basis through direct contact or by sending a request slip to appropriate staff.  Action taken by the inmate to resolve the situation must be indicated on the grievance form, Section B.

The Grievance Form, DC 804, Part I, is available in each Housing Unit or upon request from Unit staff.  This is the proper form to be used for submission of a grievance and it should be completed according to the directions provided.

**It is required that a genuine effort be made to resolve the problem before the grievance system is used. The inmate must document these efforts in Section B of the Grievance Form. Failure to do so may result in the grievance being returned to the inmate without action. The inmate may then refile the grievance with Section B properly completed.**

C.  Any inmate using the grievance system shall do so in good faith and for good cause.

No one shall be punished, retaliated against or otherwise harmed for good faith use of this grievance system.

Deliberate misuse of the grievance system may result in restricted access or disciplinary action, at the discretion of the Facility Manager.

D.  It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues.  For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review.  See VI., C. 1.

E.  The Inmate Grievance Review System is intended to deal with a wide range of issues, procedures or events which may be of concern to inmates.  It is not meant to address incidents of an urgent or emergency nature. When faced with such an event, the inmate should contact the nearest staff member for immediate assistance.

## VI. PROCEDURES

A.  A Grievance shall be submitted to the Grievance Coordinator in the following manner.

1.  All grievances shall be in writing and in the format provided on the forms supplied by the institution (DC-804 Part 1). See Section V., B.

2.  All grievances shall be presented individually. Any grievance submitted by a group of inmates will not be processed, however, if the Grievance Coordinator believes that the issue being grieved is legitimate, it will be referred to appropriate Management Staff for review.

3.  Only an inmate who has been personally affected by a Department or institution action or policy shall be permitted to seek review of a grievance or appeal.   The inmate grievant must sign the grievance or appeal.

4.  All grievances and appeals must be presented in good faith.  They shall include a brief statement of the facts relevant to the claim. The text of the grievance must be legible and presented in a courteous manner. The inmate should identify any persons who may have information which could be helpful in resolving the grievance.  The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, the ICU Consent Decree or other law. The inmate may request to be personally interviewed prior to the decision on Initial Review.  Any inmate who submits a grievance containing false and malicious information may be subject to disciplinary action.

5. Grievances and appeals based on different events should be presented separately, unless it is necessary to combine the issues to support the claim. The Grievance Officer may combine multiple grievances which relate to the same subject.

   **NOTE:**     At any point in the grievance process, the inmate has the right to withdraw the grievance.

B. **Initial Review**

1. Initial Review Procedures must be completed before Appeal from Initial Review or Final Appeal may be sought. Any claims of violation of the ICU Consent Decree must be raised through this grievance procedure before they may be addressed by any court.

2. Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause.

3. The Grievance Coordinator will forward the grievance to the appropriate Grievance Officer for investigation and resolution. The inmate grievant and other persons having personal knowledge of the subject matter may be interviewed. A grievant who has requested a personal interview, shall be interviewed.

4. Within ten (10) working days of receipt of the grievance by the Grievance Officer, the grievant shall be provided a written response to the grievance to include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issues raised in the grievance.

   The Grievance Coordinator may authorize an extension of up to an additional ten (10) working days if the investigation of the grievance is pending. If an extension is necessary, the grievant shall be so advised in writing.

C. **Appeal from Initial Review**

1. An Initial Review Decision of a grievance on a Health Care or medical treatment issue may be appealed directly to the Central Office Medical Review Committee for Final Review within five (5) days of receipt by the inmate of the Initial Review decision. A grievance for which the Corrections Health Care Administrator conducted the Initial Review will usually be considered a Medical Grievance.

   All other appeals will be submitted as follows.

2. An inmate may appeal an initial review decision to the Facility Manager or Community Corrections Regional Director in writing, within five (5) days from the date of receipt by the inmate of the Initial Review decision. The inmate must appeal in this manner prior to seeking Final Review. Only issues which were raised for initial review may be appealed.

3. All appeals must conform to the requirements specified in Section VI A of this directive. The appeal must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any initial review decision will be permitted.

4. The Facility Manager or Regional Director must notify the inmate of his/her decision within ten (10) working days after receiving the appeal. This decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision.

**D.  Final Review**

1.  Any inmate who is dissatisfied with the disposition of an Appeal from Initial Review decision, may, within seven (7) days of receiving the decision, appeal any issue related to non-compliance with the ICU Consent Decree, other law, Department directive or policy, for final review.  Only issues raised at the Initial Review and Appeal level may be referred for Final Review.

2.  Final Review will not be permitted until the inmate has complied with all procedures established for Initial Review and Appeal from Initial Review. Exceptions may be made for good cause.

3.  Final Review of all appeals will be sent directly to the CORC except the following:

    a. Medical Grievances which will be reviewed by COMRC.

    b. Requests  for Final Review of appeals  from disciplinary actions which were processed through DC-ADM 801. These will be reviewed by the Office of the Chief Counsel which may respond directly to the inmate or refer the appeal to the Central Office Review Committee (CORC) for further reviews.

The address of the CORC/COMRC is:

> **PA DEPARTMENT OF CORRECTIONS**
> **CENTRAL OFFICE REVIEW COMMITTEE**
> **PO BOX 598/2520 LISBURN ROAD**
> **CAMP HILL, PA  17001-0598**

4.  Requests for Final Review must clearly identify the decision appealed from and all reasons for appeal.  Only one appeal from any second level (Appeal from Initial Review) decision will be permitted.

5.  The CORC\COMRC, or any member thereof, may require additional investigation to be made prior to a decision on a Final Review appeal.

6.  The CORC\COMRC will review all issues properly raised according to the above procedures. It may also review and consider any other related matter.

7.  For all Appeals receiving Final Review, the CORC/COMRC will issue its decision within twenty-one (21) days after receipt of an appeal.   The decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding,  and must include a brief statement of the reasons for the decision.  The committee shall notify the grievant and Facility Manager/Regional Director of its decision and rationale.

8.  The Chief Counsel will notify counsel for the ICU class of disposition by the CORC/COMRC of any matter raised on Final Review alleging a violation of the ICU Consent Decree.

**E.  Exceptions**

Initial Review and Appeal  from Initial Review of  issues related to the following Administrative Directives shall be in accordance with procedures outlined therein, and will not be reviewed by the Grievance Officer or Grievance Coordinator.

1.  DC ADM 805 - Policy & Procedures for Obtaining Pre-Release Transfer.

2.  DC ADM 801 - Inmate Disciplinary and Restricted Housing Unit Procedures. See DC-ADM 801 VI., G & I.

3.  DC ADM 802 - Administrative Custody Procedures. See DC-ADM 802, VI, B, 1,2. Appeal from Initial Review, see DC-ADM 802, VI, B, 4, a.

4. **DC-ADM 814** - Incoming Publications

See 814-IIIB. Appeal from Initial Review, see 814-IIID.

Additionally, there may be other kinds of issues for which Initial Review Procedures have been previously established by Administrative Memorandum or Policy Statement.

F. Admissions and Review

1. All proceedings pursuant to this directive are in the nature of settlement negotiations and will, therefore, be inadmissible before any court or other tribunal in support of any claim made against the Commonwealth or any employee. No resolution of any grievance offered as a result of this procedure shall be admissible before any court or other tribunal as an admission of violation of the ICU Consent Decree or any State or federal law.

2. No decision rendered as a result of the processing of a grievance shall be reviewable by any court unless it establishes a system or institution-wide violation of the decree.

G. Completion of Review After Transfer

Any inmate who is transferred after the filing of a grievance or appeal, but prior to the completion of the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager or Regional Director of the facility in which confined when the grievance was filed. Adjustments in the various time limitations may be made to facilitate review.

## VII. SUSPENSION DURING EMERGENCY

In an emergency situation or extended disruption of normal institutional operation, any provision or section of this policy may be suspended by the Commissioner or his/her designee for a specific period of time.

## VIII. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department of Corrections.

## IX. SUPERSEDED POLICY AND CROSS-REFERENCE

This directive revises the Inmate Grievance System (DC-ADM 804, MAY 1, 1984), and supersedes the pilot grievance system in effect at selected DOC institutions. It does not supersede or repeal any portion of any other directive or policy statement. Where this directive is inconsistent with any other directive or policy, both shall be interpreted so as to provide full review of all issues raised, consistent with the scope and purpose of this directive. Conflicts will most frequently occur at the Initial Review level, where other directives establish committees to review specific issues.

Cross References:  DC-ADM 801, DC-ADM 802

ACA Cross-References: 3-4271

cc:  Executive Deputy Commissioner Reid
      Deputy Commissioner Clymer
      Deputy Commissioner Fulcomer
      Acting Deputy Commissioner Beard
      All Superintendents
      CCC Directors (4)
      File

Joseph D. Lehman,
Commissioner



| | Bulletin |
|---|---|
| | **Commonwealth of Pennsylvania • Department of Corrections** |

| To: | Policy Subject: |
|---|---|
| **Superintendents**<br>**Boot Camp Commander**<br>**Regional Directors**<br>**Executive Staff** | **DC-ADM 804**<br>**CONSOLIDATED INMATE GRIEVANCE**<br>**REVIEW SYSTEM** |
| | Policy Number:    **DC-ADM 804-1** |
| | Policy Issue Date:  **July 20, 1994** |

| Date of Issue:<br>April 2, 1996 | Authority: | Effective Date:<br>May 20, 1996 |
|---|---|---|

The purpose of this Bulletin is to include medical grievances in the regular grievance process and to **discontinue** the Central Office Medical Review Committee (COMRC). .

It is important that the Superintendent be aware of all functions within the institution. Similarly, it is essential that the Bureau of Health Care Services be included in the CORC process, to include review by the Chief Counsel's office with respect to medical grievances. Therefore, all grievances, including those relating to medical issues, are to be processed in the same manner. The grievance coordinator will continue to forward medical grievances to the CHCA for initial review. Then, the Superintendent will be responsible for the Appeal from Initial Review, as for all other grievances.

Final Appeal of medical grievances will no longer be forwarded to the COMRC. The Central Office Review Committee (CORC) will process the appeals. The Director of the Bureau of Health Care Services, or designee, will participate as a member of CORC for all medical grievance appeals.

The following sections of DC-ADM 804 are to be **discontinued**:

IV.E.:      Definition of COMRC

IV.G.:      "An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.

V.D.:       "It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review."

**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| | |
|---|---|
| **To:** Executive Staff<br>Superintendents<br>Regional Directors | **Policy Subject:** Consolidated Inmate<br>Grievance Review System |
| | **Policy Number:** DC-ADM 804-2 |
| | **Policy Issue Date:** July 20, 1994 |
| **Date of Issue:**<br>October 1, 1997 | **Authority:** Martin F. Ho | **Effective Date:**<br>November 1, 1997 |

The procedures for appeal to final review under DC-ADM 804, VI, D, 5-7, are amended as follows:

(1)    The Chief Hearing Examiner will replace the Central Office Review Committee (CORC) at final review of all grievance appeals. The Chief Hearing Examiner will perform all functions previously performed by CORC.

(2)    In reviewing grievances submitted for final review, the Chief Hearing Examiner will review the initial grievance and response, any appeals therefrom and the responses thereto and the issues appealed to final review.

(3)    The Chief Hearing Examiner will review health care related grievances with the Bureau of Health Care. Appeals raising legitimate legal issues, including but not limited to access to courts and sentencing issues, will be reviewed with an attorney prior to response.

(4)    Upon completion of final review, the Chief Hearing Examiner will respond directly to the inmate in all cases where the position taken by the institution is upheld.

(5)    In all cases where the action of the Grievance Coordinator, PRC, Incoming Publication Review Committee, or Superintendent is reversed or amended, or where a matter is remanded, the Chief Hearing Examiner will prepare a letter to the inmate and a memorandum to the Superintendent. The Chief Hearing Examiner will forward the letter and memorandum to the appropriate Regional Deputy Commissioner for review and signature.

(6)    The Chief Hearing Examiner will be responsible for assuring that:

(a)    appeals to final review are responded to in a timely fashion;
(b)    records pertaining to such appeals are maintained properly; and
(c)    counsel for the ICU class is notified of the disposition at final review of any matter raised to final review alleging a violation of the ICU vs Shapp Consent Decree.

It is the intent of the Department of Corrections to provide inmates with a complete and timely review of all appeals properly raised to final review. These amendments have been established to ensure timeliness at final review while continuing to provide a thorough, impartial review of the issues.



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Executive Staff<br>Superintendents<br>Regional Directors<br>Boot Camp Commander | Policy Subject: | Consolidated Inmate<br>Grievance Review System |
| --- | --- | --- | --- |

**Policy Number:** DC-ADM 804-3

**Policy Issue Date:** July 20, 1994

| Date of Issue:<br><br>October 21, 1997 | Authority: | Effective Date:<br><br>November 1, 1997 |
| --- | --- | --- |

The purpose of this bulletin is to facilitate timely responses from the Chief Hearing Examiner's Office to all appeals to final review.

(1) All appeals to final review should be addressed to the Chief Hearing Examiner.

>Chief Hearing Examiner
>1451 S. Market Street
>Elizabethtown, PA 17022

Appeals which are addressed to the Commissioner, Chief Counsel, to other Central Office staff, are of course, delivered to these individuals first, then have to be referred to the Chief Hearing Examiner. Improperly addressed appeals may cause a delay in the response to final appeal.

(2) Inmates appealing to final review are responsible for providing the reviewing body with any available paperwork relevant to the appeal. A proper appeal to final review should include photocopies of the initial grievance, initial grievance response, and the Superintendent's response. Appeals without proper records will be reviewed, but the review will be delayed until the appropriate paperwork can be obtained.

| | Bulletin |
|---|---|
| | **Commonwealth of Pennsylvania • Department of Corrections** |

| **To:** | **Policy Subject:** |
|---|---|
| Executive Staff<br>Superintendents<br>CCC Regional Directors<br>Boot Camp Commander | Consolidated Inmate Grievance Review System |
| | **Policy Number:** DC-ADM 804-4 |
| | **Policy Issue Date:** July 20, 1994 |

| **Date of Issue:** | **Authority:** | **Effective Date:** |
|---|---|---|
| April 29, 1998 | Martin F. Horn | May 1, 1998 |

The purpose of this bulletin is to amend the section VI. Procedures, A.4. to read,

"All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text must be legible and presented in a courteous manner. The Grievant should identify any persons who may have information which could be helpful in resolving the grievance. The Grievant may specifically raise any claims concerning violations of Department of Corrections directives, regulations, court orders, or other law. The Grievant may also include a request for compensation or other legal relief normally available from a court. The inmate may request to be personally interviewed at initial review. Any inmate who submits a grievance containing false information may be subject to disciplinary action. Inmates who have not already completed final review may request compensation or legal relief on appeal to final review."

And to amend Section VI. Procedures, B. Initial Review, 2. to read:

"Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause. Such extensions will normally be granted if the events complained of would state a claim of violation of federal right.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MILTON AMEY,             :      **CIVIL ACTION NO. 3:CV-02-1493**
          Plaintiff    :
                   :      (JUDGE NEALON)
     v.            :
                   :
COMMONWEALTH OF ,    :
PENNSYLVANIA, ET AL.,   :
         Defendants   :

## <u>ORDER</u>

The Plaintiff, Milton Amey, a state prisoner confined at the State Correctional Institution at Mahanoy, in Frackville, Pennsylvania, initiated this action by filing a complaint in the Court of Common Pleas of Schuylkill County, Pennsylvania. The matter was removed to this court by the Defendants on August 26, 2002, pursuant to 28 U.S.C. §1441(b) which provides for removal of any civil action in which the district court has original jurisdiction founded on a claim or right arising under the Constitution, treatises, or laws of the United States. The basis of the removal was the Plaintiff's inclusion in his state court complaint of a "claim of inadequate medical care based on deliberate indifference pursuant to 42 U.S.C. §1983." (Doc. 1, p. 1). Presently pending before the Court and ripe for disposition are the following motions: Plaintiff's Motions to Remand (Docs. 10 and 11); Motion to Dismiss filed on behalf of Defendant Joseph Rush, P.A. (Doc. 7); and, Motion to Dismiss filed on behalf of the Corrections Defendants (Doc. 9). For the reasons that follow, the Motions to Dismiss will be granted inasmuch as they seek dismissal of the Plaintiff's civil rights claim. The Plaintiff's motions to remand will be rendered moot based on the decision not to exercise pendent jurisdiction and to remand the remaining state court claims to the Court of Common Pleas of Shuylkill County.



I. <u>Motions to Dismiss.</u>

    *A. Standard.*

    When evaluating a motion to dismiss, the court must accept all material allegations of the complaint as true and construe all inferences in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A complaint should not be dismissed for failure to state a claim unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 44-46 (1957); *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir. 1988). A complaint that sets out facts which affirmatively demonstrate that the plaintiff has no right to recover is properly dismissed without leave to amend. *Estelle v. Gamble*, 429 U.S. 97, 107-108 (1976).

    *B. Discussion.*

    The Defendants first seek to dismiss the complaint for failure to exhaust administrative remedies. In support of their argument, they state that the Plaintiff conceded his failure to exhaust his administrative remedies in his motion to remand. However, in subsequent filings, the Plaintiff stated that "[t]he Exhaustion of remedies is not required in the State Courts, and the plaintiff chose that court for his remedies, however, the first choice was the federal courts, because the plaintiff had no knowledge of his choice of remedies untill (sic) he did some research. The exhaustion of his state remedies has been done well before this action was litigated in the court of Common Pleas for the Schuylkill County of Pennsylvania. Exhibits have been forwarded to the courts and the defendants named in this civil action." (Doc. 30, p. 1).

2

The law provides as follows: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a); *see Booth v. Churner*, 532 U.S. 731 (2001).   The Supreme Court has made clear that prisoners must exhaust administrative remedies as to any claim that arises in the prison setting, regardless of any limitations on the kind of relief that may be gained through a grievance process. *See Porter v. Nussle*, 122 S.Ct. 983, 992 (2002)("we hold that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."); *Booth v. Churner*, 121 S.Ct. 1819, 1825 n. 6 (2001)("we hold ... that Congress has provided in § 1997e(a) that an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues.).   Thus, prisoners are required to exhaust available administrative remedies prior to seeking relief pursuant to § 1983 or any other federal law. The Third Circuit Court of Appeals has concluded that "it is beyond the power of this court...to excuse compliance with the exhaustion requirement." *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000). However, compliance with the administrative remedy scheme will be satisfactory if it is substantial. *Id*. at 77-78.

The Pennsylvania Department of Corrections provides an administrative grievance system that requires inmates to file formal written grievances following unsuccessful informal resolution of a problem.  If an inmate is dissatisfied with the initial review response, the inmate may appeal to the facility

manager/regional director.  (Doc. 33, Exhibit A, DC-ADM 804).  Any inmate who is dissatisfied with the

disposition of an appeal from initial review decision may appeal to the chief grievance coordinator.

The Plaintiff has submitted copies of administrative remedy requests and the responses to those

requests in an effort to demonstrate that he has exhausted his administrative remedies concerning the issue

of his medical care.  For instance, on May 14, 2001, the Plaintiff submitted a request to a staff member

wherein he raises the issue of the manner in which the medical personnel are treating his diabetes.

Essentially, he takes issue with the fact that he has been given significant amounts of medication, which has

adverse side effects, to control his diabetes as opposed to being placed on a diet and exercise regimen.

(Doc. 27, Inmate's request to staff member dated May 14, 2001).  This request was responded to by

Marva J. Cerullo on May 16, 2001.  He again raised this issue in requests dated May 21, 2001, and June

4, 2001.  (Doc. 27, Inmate's requests to staff member dated May 21, 2001 and June 4, 2001).  These

requests were responded to on May 23, 2001, by Marva J. Cerullo and on June 6, 2001, by

Superintendent Shannon.  On July 6, 2001, he appealed a grievance that was assigned grievance number

MAH-0735-01 which dealt with Plaintiff's difficulties with his medical treatment.  On November 4, 2001,

he received a letter from the chief grievance coordinator which acknowledged the appeal to final review of

grievance number MAH-0735-01 and concluded that "it is the decision of this office to uphold the

responses provided by staff at institutional level.  I find the issues raised for final review have been

addressed by the Grievance Coordinator and the Superintendent, and their responses are reasonable and

appropriate.  Your diabetes was not caused by medication.  The medication was necessary to control your

increased blood levels."  (Doc. 27, Correspondence dated November 4, 2001 from Thomas L. James,

Chief Grievance Coordinator to Milton Amey).

4

Although it is clear from the above that the Plaintiff did appeal grievance "MAH-0735-01" to final review, it is equally clear that the Plaintiff did not satisfy the exhaustion requirement in that the relief sought through the grievance procedure is wholly different than the relief requested in the Plaintiff's civil rights claim. Specifically, in the administrative process, the Plaintiff was seeking to alter the manner in which his diabetes was treated. At no point does he request monetary relief. In his complaint, he is seeking monetary damages. His failure to request monetary relief during the administrative process is fatal to his claim. In raising this issue, Defendant Rush relies on the case of *Geisler v. Hoffman*, No. 99-1971, slip op. (3d Cir. Sept. 29, 2000), an unreported/unprecedential Third Circuit Court of Appeals Memorandum.

The Court stated in *Geisler*: "And, we note, Geisler's grievances sought relief wholly different from the monetary remedy that he subsequently sought from the District Court. To this end, even if Geisler had brought his grievances before the two appellate tiers provided for by DC-ADM 804, exhaustion in that setting clearly would not have exhausted his current claim for monetary relief, a claim which he never began to pursue administratively." *Geisler, supra*, at 5. This is similar to the situation the Court is presented with here. Unlike Geisler, the Plaintiff did exhaust to final review. However, the Plaintiff did not request any monetary relief at the administrative level. Effective May 1, 1998, the Department of Corrections amended DC-ADM 804 to provide that a prisoner, in seeking review through the grievance system, may include requests for "any claims concerning violations of Department of Corrections directives, regulations, court orders, or other laws." (Doc. 33, DC-ADM 804-4, issued April 29, 1998).

Other cases in this District, relying upon *Geisler*, have held that an inmate plaintiff's failure to seek monetary damages *via* the prison grievance procedure precluded the prisoner from pursuing such relief under § 1983. *See Stanton v. Meyers*, Civil No. 3:CV-98-1453 (M.D.Pa. September 26,

5

2002)(Munley, J.), *See Thomas v. Meyers*, Civil No. 3:CV-00-1887 (M.D.Pa. March 25, 2002)(Caputo, J.)); *Chimenti v. Kimber*, Civil No. 3:CV-01-0273, slip op. at 11 (M.D. Pa. March 15, 2002(Vanaskie, C.J.)); *Laird v. Pennsylvania Department of Corrections*, Civil No. 3:CV-00-1039, slip op. at 3 (M.D. Pa. Sept. 26, 2001 (Nealon, J.)). Amey did not include a request for monetary damages in his administrative complaint. Thus, Plaintiff's §1983 claim against the defendants, for which he seeks monetary relief, is foreclosed as a consequence of his failure to seek such relief through the DOC grievance process.

   *C. Conclusion.*

   Based on the foregoing, the Defendants' motions to dismiss the Plaintiff's complaint (Docs. 7 and 9) will be granted with respect to the Section 1983 claim only.

II. <u>Motions to Remand.</u>

   This matter was removed to federal court on August 26, 2002. (Doc. 1). On September 26, 2002, and September 27, 2002, the Plaintiff filed motions to remand the matter to the Court of Common Pleas of Schuylkill County pursuant to 28 U.S.C. §1447(c). (Docs. 10 and 11). If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. 28 U.S.C. § 1447(c) (Supp.2002) (emphasis added). After the dismissal of the 42 U.S.C. § 1983 claim, since this court lacks original jurisdiction over all the remaining state law claims such as negligence, bad faith, and recklessness, all state law claims will be remanded to the Court of Common Pleas of Schuylkill County and the Plaintiff's motions to remand will be denied as moot. *See Cook v. Wikler*, 320 F.3d 431 (3d Cir. 2003); *Borough of West Mifflin v. Lancaster*, 45 F.3d 780 (3d Cir. 1995)(district court

should decline to decide pendent state law claims where the claims over which the district court has original jurisdiction are dismissed before trial).

AND NOW, THIS 4th DAY OF APRIL, 2003, IT IS HEREBY ORDERED THAT:

1. The Defendants' motions to dismiss the Plaintiff's complaint (Docs. 7 and 9) are GRANTED with respect to the Plaintiff's 42 U.S.C. §1983 claim only;

2. The Clerk of Court shall REMAND the remaining state law claims to the Court of Common Pleas of Schuylkill Count pursuant to 28 U.S.C. §1447(c) as the Court declines to exercise pendent jurisdiction over those claims;

3. The Plaintiff's motions to remand (Docs. 10 and 11) are rendered MOOT;

4. The Clerk of Court is directed to CLOSE this case;

5. An appeal from this Order will be deemed frivolous, without good faith and lacking in probable cause.

s/ William J. Nealon
**United States District Judge**

(28)
9/25/02
ep

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


DARREN STILL,                          :
                                       :
           Plaintiff                   :
                                       :
    v.                                 :    CIVIL NO. 4:CV-01-2287
                                       :
PENNSYLVANIA DEPARTMENT                :
OF CORRECTIONS, ET AL.,                :    (Judge Jones)
                                       :
           Defendants                  :

**FILED**
WILLIAMSPORT, PA

SEP 2 4 2002

## <u>MEMORANDUM AND ORDER</u>

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

September **2 4** , 2002

## <u>Background</u>

This <u>pro se</u> civil rights action pursuant to 42 U.S.C. § 1983 was initiated by

Darren Still, an inmate presently confined at the Retreat State Correctional Institution,

Hunlock Creek, Pennsylvania (SCI-Retreat). Plaintiff's <u>in forma pauperis</u> application

was previously construed as a motion to proceed without full prepayment of fees and

costs and granted. By Order dated August 7, 2002, this matter was reassigned to the

undersigned.



Named as Defendants are the Pennsylvania Department of Corrections (DOC) and three of its officials, Secretary Jeffrey Beard; ex-Secretary Martin Horn; and Chief Grievance Coordinator Thomas James. Still is also proceeding against the following SCI-Retreat officials: Superintendent Edward J. Klem; Deputy Superintendent of Centralized Services Joseph Piazza; Deputy Superintendent for Facilities Management Charles Erickson; Superintendent's Assistant Joseph Lenygel; Health Care Administrator Joseph Mattaloni[1]; Physician's Assistant (PA) James Updyke[2] and Doctor R. T. Diaz.

Still fractured his tibia while playing basketball at SCI-Retreat on December 8, 1999. Following the accident, x-rays were taken by the prison's medical staff and Plaintiff was returned to his cellblock. Those actions were purportedly taken in accordance with a policy developed by Health Care Administrator Mataloni. Plaintiff asserts that approximately four (4) hours later, he was given "a bag of ice and some tylenol." Record document no. 1, ¶ 64. The next day, Still was taken to an outside physician, Doctor Raklewicz, for treatment. His initial claim maintains that the decision to return him to his cell after the taking of x-rays violated his civil rights,

---

[1] The proper spelling of this name is Mataloni.

[2] This Defendant indicates that the correct spelling of his name is Updike.

2

because Dr. Raklewicz allegedly stated that sending him back to his cellblock "just made the plaintiff's condition worse." Id. at ¶ 65.

On December 10, 1999, Dr. Raklewicz performed surgery on Still's knee. Upon his return to SCI-Retreat on December 13, 1999, Still was placed in the SCI-Retreat infirmary.  He remained in the infirmary until March 15, 2000.  "On July 31, 2000, Plaintiff wrote a request to Defendant Updyke [sic] concerning pain in the plaintiff's knee and because a knee support was ordered but never given." Id. at ¶ 23. PA Updike responded on August 1, 2000, advising Still to purchase pain medication from the commissary and denying his request for a knee support.  Plaintiff's second claim maintains that Updike's lack of action constituted deliberate indifference to his medical needs.

The complaint next contends that Health Care Administrator Mataloni was deliberately indifferent for overruling a decision by a physical therapist that Still should "go to the gym for therppay [sic] for his knee." Id. at ¶ 70.  He adds that Mataloni denied the request on the basis that the gym was only to be utilized by inmates over the age of forty (40), despite the fact that other inmates were granted permission to use the gym even though they were under forty (40) years of age.

It is also alleged that Updike and Mataloni retaliated against Still by clearing him to return to work and doctoring medical reports.  These retaliatory acts

3

were purportedly taken in response to Plaintiff's submission of numerous grievances against those Defendants and resulted in unwarranted "misconducts, segregation and constant harassment." Id. at ¶ 73.

With respect to Dr. Diaz, the Plaintiff generally contends that on October 10, 2001, he wrote to Diaz "concerning his medical care." Id. at ¶ 55. The next day Sill acknowledges that he received a reply from Diaz telling him to sign up for sick call. Plaintiff's final claim is that the remaining Defendants, Secretary Beard, ex-Secretary Horn and Chief Grievance Coordinator James, failed to grant him relief on administrative grievances which he filed regarding the above allegations. His complaint seeks compensatory and punitive damages.

On February 14, 2002, Defendants DOC, Beard, Horn, Klem, Piazza, Erickson, James, Lengyel and Mataloni, collectively referred to as the Corrections Defendants filed a motion seeking dismissal of the complaint for both failure to exhaust administrative remedies and for failure to state a claim upon which relief may be granted. See Record document no. 10. Thereafter, remaining Defendants Updike and Diaz filed a similar motion to dismiss. See Record document no. 13. Both motions have been briefed and are ripe for consideration.

**Discussion**

4

A court, in rendering a decision on a motion to dismiss, must accept the veracity of the plaintiff's allegations. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); White v. Napoleon, 897 F.2d 103, 106 (3d Cir. 1990). In Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996), our Court of Appeals for the Third Circuit added that when considering a motion to dismiss based on a failure to state a claim argument, a court should "not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims." "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

"The test in reviewing a motion to dismiss for failure to state a claim is whether, under any reasonable reading of the pleadings, plaintiff may be entitled to relief." Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993) (citation omitted). Additionally, a court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them." Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990); Independent Enters., Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1168 (3d Cir. 1997). Finally, it is additionally well-settled that pro se complaints should be liberally construed. Haines v. Kerner, 404 U.S. 519, 520 (1972). This court will now discuss Defendants'

5

respective motions in light of the standards set forth above and Rule 12(b)(6) of the Federal Rules of Civil Procedure.

**Updike and Diaz**

PA Updike and Dr. Diaz's motion to dismiss asserts that: (1) Plaintiff failed to comply with the exhaustion of administrative remedies requirement and (2) the complaint fails to sufficiently allege that either Updike or Diaz were deliberately indifferent to a serious medical need. The moving Defendants initially argue that "Still has not indicated in his complaint that he has exhausted all of his available administrative remedies." Record document no. 15, ¶ IV(A). They add that the grievances which were submitted by Plaintiff did not seek monetary relief. Furthermore, there is no indication that any grievance was ever filed with respect to the allegations asserted against Dr. Diaz.

42 U.S.C. § 1997e(a) provides as follows:

> No action shall be brought with respect to prison conditions under Section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Section 1997e(a) requires administrative exhaustion "irrespective of the forms of relief sought and offered through administrative avenues." Porter v. Nussle, 122

6

S.Ct. 983, 992 (2002); <u>Booth v. Churner</u>, 532 U.S. 731, 741 n. 6 (2001). Claims for

monetary relief are not excused from the exhaustion requirement. <u>Nyhuis v. Reno</u>,

204 F.3d 65, 74 (3d Cir. 2000). Dismissal of an inmate's claim is appropriate when a

prisoner has failed to exhaust his available administrative remedies before bringing a

civil rights action. <u>Ahmed v. Sromovski</u>, 103 F. Supp. 2d 838, 843 (E.D. Pa. 2000).

"[E]xhaustion must occur prior to filing suit, not while the suit is pending." <u>Tribe v.</u>

<u>Harvey</u>, 248 F.3d 1152, 2000 WL 167468, *2 (6th Cir. 2000)(citing <u>Freeman v.</u>

<u>Francis</u>, 196 F.3d 641, 645 (6th Cir. 1999)).

　　　　An inmate's failure to comply with the administrative exhaustion

requirement constitutes an affirmative defense. <u>See</u> <u>e.g.</u>, <u>Massey v. Helman</u>, 196 F.3d

727, 735 (7th Cir. 2000), <u>cert.</u> <u>denied</u>, 532 U.S. 1065 (2001); <u>Jenkins v. Haubert</u>, 179

F.3d 19, 29 (2d Cir. 1999); <u>Robinson v. Dalton</u>, 107 F.3d 1018, 1021 (3d Cir.

1997)(holding, in the context of a Title VII case, that failure to exhaust administrative

remedies is an affirmative defense). Consequently, a prisoner does not have to allege

in his complaint that he has exhausted administrative remedies. <u>Ray v. Kertes</u>, 285

F.3d 287 (3d Cir. 2002). Rather, it is the burden of a defendant asserting the defense

to plead and prove it. <u>Id.</u>; <u>Williams v. Runyon</u>,130 F.3d  568, 573 (3d Cir. 1997);

<u>Charpentier v. Godsil</u>, 937 F.2d 859 (3d Cir. 1991); Fed. R. Civ. P. 8(c).

The Pennsylvania Department of Corrections has a Consolidated Inmate Grievance Review System. DC-ADM 804 (effective January 1, 2001). With certain exceptions not applicable here, DC-ADM 804, Section VI ("Procedures") provides that, after attempted informal resolution of the problem, a written grievance may be submitted to the Grievance Coordinator; an appeal from the Coordinator's decision may be made in writing to the Facility Manager or Community Corrections Regional Director; and a final written appeal may be presented to the Secretary's Office of Inmate Grievances and Appeals.

A prisoner, in seeking review through the grievance system, may include requests for "compensation or other legal relief normally available from a court." (DC-ADM 804-4, issued April 29, 1998.) Furthermore, [g]rievances must be submitted for initial review to the Facility/Regional grievance Coordinator within fifteen (15) days after the events upon which the claims are based," but allowances of extensions of time for good cause, "will normally be granted if the events complained of would state a claim of a violation of a federal right." Id.

With respect to Dr. Diaz, the motion to dismiss notes that there is no indication that the Plaintiff filed any administrative grievance regarding the conduct of said Defendant. Still's opposing brief to the motion to dismiss likewise offers no evidence that he ever initiated an administrative grievance against Dr. Diaz.

8

Consequently, pursuant to the requirements of § 1997e(a), Diaz is entitled to an entry of dismissal.[3]

In response to PA Updike's failure to exhaust argument, Still has submitted a copy of a grievance (RET 0256-00) dated July 31, 2000, wherein he contended that Updike acted improperly by telling him to obtain pain medication from the commissary and denying his request for a knee support.[4]  See Record document no. 21, Exhibit B.  Plaintiff also filed a grievance, (RET 0252-00), regarding his lack of eligibility to attend therapy in the over 40 gym.[5]  A thorough review of those grievances reveals that neither specifically sought monetary compensation.  Appeals from the denial of both grievances were denied by Grievance Coordinator Lengyel,

---

[3] It is additionally noted that there are no allegations set forth in the complaint which would support a claim that Dr. Diaz was deliberately indifferent to the Plaintiff's medical needs.  Specifically, the complaint alleges only that Diaz promptly responded to Still's request for medical care by telling him to sign up for sick call.

[4] In addition, this claim of deliberate indifference is undermined by a copy of an August 16, 2000 reply to grievance RET 0256-00, which was submitted by Plaintiff in opposition to the motion to dismiss.  The reply states that "[a]ccording to your consultation with the physical therapist, a brace was not indicated for your treatment."  Record document no. 21, Exhibit B.

[5] Still acknowledges that he was granted leave to attend an over 40 physical fitness class on July 13, 2001.  See id. at Exhibit E.

9

Superintendent Klem, the DOC's Chief Hearing Examiner, and Chief Grievance Coordinator James.

The Plaintiff also filed and exhausted a grievance , (RET 0327-00) on October 10, 2000, which alleged that Updike and Mataloni had medically cleared him to return to work without further examination of his knee, See id. at Exhibit C.[6]  This grievance likewise did not ask for monetary relief.  However, a review of the record provides no indication that Still ever filed a grievance which alleged retaliation or that PA Updike had altered his medical reports.  Consequently, those claims are subject to dismissal under § 1997e(a).

The moving Defendants argue that Still's complaint must be dismissed because he did not seek monetary compensation through the administrative process. In support, they rely upon Geisler v. Hoffman, No. 99-1971 (3d Cir. Sept. 29, 2000), an unpublished opinion from the Third Circuit.  In Geisler, the Third Circuit did rule that an inmate's claim for monetary relief was barred because he had not sought such relief in the administrative process.

---

[6]    A submission by the Plaintiff establishes that as of October 26, 2000, Dr. Diaz determined that he was not medically cleared for kitchen work.  See id. at Exhibit C.

10

Two learned members of this Court, relying upon Geisler, have held that an inmate plaintiff's failure to seek monetary damages via a prison grievance procedure precluded the prisoner from pursuing such relief under § 1983. See Laird v. Pennsylvania Department of Corrections, Civil No. 3:CV-00-1039, slip op. at 3 (M.D. Pa. Sept. 26, 2001) (Nealon, J.); Chimenti v. Kimber, Civil No. 3:CV-01-273, slip op. at 11 (M.D. Pa. March 15, 2002)(Vanaskie C.J.). This Court agrees with the determinations announced in Geisler, Laird, and Chimenti, and likewise concludes that an inmate's failure to seek monetary relief when such a remedy is available through an available prison grievance procedure precludes him from subsequently obtaining such relief in a civil rights action.[7]

Still's present complaint seeks only compensatory and punitive damages. However, as noted above, he did not include a request for monetary damages in his administrative grievances. Thus, Plaintiff's claims against PA Updike which were administratively exhausted within the DOC are nonetheless foreclosed as a

---

[7] This Court recognizes that a recent, post-Geisler decision rendered by Judge Caldwell of this Court reached the contrary conclusion that failure to seek a specific monetary remedy within an institutional grievance by itself was not an adequate basis for dismissal under § 1997e(a). Woods v. Beard, Civil No. 1:CV-01-2249, slip op. at 7-9 (M.D. Pa. Sept 3, 2002)(Caldwell, J.).

11

consequence of the failure of his grievances to seek monetary relief. Updike's request for dismissal will also be granted.

**Corrections Defendants**

The Corrections Defendants argue that they are entitled to an entry of dismissal on the bases that: (1) the DOC is not a person for purposes of § 1983; (2) Plaintiff has not alleged that he has exhausted his available administrative remedies; (3) the claims against Beard and Horn are premised on a theory of respondeat superior; (4) a valid claim of deliberate indifference has not been stated; and (5) Plaintiff has not set forth a cognizable claim of retaliation against Defendant Mataloni; and (6) they are entitled to qualified immunity.

The Corrections Defendants initially argue that the DOC is not a properly named defendant. With regards to this issue, it is well-settled that a plaintiff, in order to state a viable § 1983 claim, must plead two essential elements: 1) that the conduct complained of was committed by a person acting under color of state law, and 2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. West v. Atkins, 487 U.S. 42, 48 (1988); Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995).

The United States Supreme Court has ruled that a § 1983 action brought against a "State and its Board of Corrections is barred by the Eleventh Amendment

12

unless [the State] has consented to the filing of such a suit." Alabama v. Pugh, 438 U.S. 781, 782 (1978). The United States Court of Appeals for the Third Circuit similarly concluded that the Pennsylvania Board of Probation and Parole could not be sued because "it is not a 'person' within the meaning of Section 1983." Thompson v. Burke, 556 F.2d 231, 232 (3d Cir. 1977).

In Will v. Michigan Dep't of State Police, 491 U.S. 58 (1989), the Supreme Court reiterated its position that state agencies are not "persons" subject to liability in § 1983 actions brought in federal court. The Court noted that a § 1983 suit against a state official's office was "no different from a suit against the State itself." Id. at 71. "Will establishes that the State and arms of the State, which have traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under § 1983 in either federal or state court." Howlett v. Rose, 496 U.S. 356, 365 (1990).

After Will, our Court of Appeals held that in determining whether a state agency is entitled to Eleventh Amendment immunity, a federal court should consider: whether the state would be responsible for the payment of any judgment rendered against the agency; the source of the agency's funding; and the degree of autonomy enjoyed by the agency, as well as other similar factors. Bolden v. Southeastern Pennsylvania Transp. Auth., 953 F.2d 807, 818 (3d Cir. 1991).

In the instant case, payment of any judgment rendered against the DOC would have to be paid out of the Pennsylvania state treasury. Furthermore, that Defendant receives all of its funding from the state and does not enjoy any measure of autonomy. Therefore, it is clear under <u>Will</u> and <u>Bolden</u> that the DOC is not a "person" for the purpose of § 1983 and, therefore, not a properly named defendant.

With respect to the exhaustion argument, it is noted that the Plaintiff initially asserts that his transfer back to his cellblock after the taking of x-rays constituted deliberate indifference by prison officials. Second, Still contends that the Corrections Defendants also violated the Eighth Amendment by failing to grant him relief with respect to his various administrative grievances. Furthermore, his complaint also alleges that Health Care Administrator Mataloni violated his civil rights by denying him needed physical therapy, and by subjecting him to retaliatory treatment, i.e., altering his medical records and clearing him to return to institutional employment.

On March 27, 2000, Plaintiff filed a grievance asserting that it was improper for prison officials to return him to his cellblock pending the outcome of his December 8, 1999 x-rays and that there was a delay before he was even provided with an ice pack and Tylenol. Although the submitted copy of this grievance is not completely legible, it appears that Still requested to "be compensated." Record

14

document no. 21, Exhibit A, p. 2. The grievance was rejected as being untimely on

May17, 2000. An appeal of the rejection was filed with the Chief Hearing Examiner.

Consequently, this Court will accept Still's contention that he properly exhausted his

administrative remedies with respect to this claim.

The Plaintiff filed and fully exhausted a grievance, RET 0252-00 regarding

his lack of eligibility for the over 40 gym. See Record doc. no.21, Exhibit C. It is

again noted that Plaintiff has submitted a document indicating that he was eventually

administratively approved to participate in a over 40 fitness class on July 13, 2001.

See id. at Exhibit E. Another grievance, RET 0327-00, initiated by Still alleged that

Defendant Mataloni had acted improperly by clearing him to work in the prison

kitchen. See id. at Exhibit C. As previously discussed, documents submitted by

Plaintiff indicate that Dr. Diaz issued a determination on or about October 26, 2000

that Still was not medically cleared to begin employment in the kitchen.

There is no indication that a grievance alleging that Mataloni altered Still's

medical records was ever pursued. Hence, said claim is subject to dismissal under §

1997e(a). Furthermore, a review of the grievances which were filed provides that

they did not seek monetary relief. Thus, under Geisler, Laird, and Chimenti, this

Court is foreclosed from considering Plaintiff's claims for compensatory and punitive

15

damages stemming from Defendant Mataloni's alleged retaliation, failure to admit Plaintiff to the over 40 gym, and decision to clear him for institutional employment.[8]

The Corrections Defendants next argue that the claims against Secretary Beard and ex-Secretary Horn are solely based on those officials' supervisory capacities within the DOC. Claims brought under § 1983 cannot be premised on a theory of respondeat superior. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Rather, each named defendant must be shown, via the complaint's allegations, to have been personally involved in the events or occurrences which underlie a claim.

---

[8] In addition, the complaint fails to assert a viable claim of retaliation against Heath Care Administrator Mataloni. A claim of retaliation by government officials against an inmate for exercising his First Amendment right to register a complaint regarding prison policies is sufficient to set forth a § 1983 claim. Newsom v. Norris, 888 F.2d 371, 376-77 (6th Cir. 1989). Mere conclusory allegations of retaliation may safely be dismissed. Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983). Only complaints which allege "facts giving rise to a colorable suspicion of retaliation may proceed." Id.

In an unreported opinion, the Third Circuit Court of Appeals held that "[t]o prevail on a claim of retaliation, the prisoner must demonstrate that the prison authorities engaged in retaliatory action, and that the action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals." Brooks-Bey v. Kross, C.A. No. 94-7650, slip op. at 8 n. 14 (3d Cir. (Pa.), July 24, 1995) (Becker, C.J.), slip opinion at 7-8, citing Rizzo v. Dawson, 778 F.2d 527, 532 (9th Cir. 1985). This Court's review of the complaint establishes that there are no facts alleged which support a retaliation claim against Health Care Administrator Mataloni. Plaintiff's conclusory allegations of retaliatory conduct by said Defendant are constitutionally insufficient.

16

See Rizzo v. Goode, 423 U.S. 362 (1976); Hampton v. Holmesburg Prison Officials,

546 F.2d 1077 (3d Cir. 1976).  As explained in Rode:

> A defendant in a civil rights action must have personal
> involvement in the alleged wrongs. . . .  [P]ersonal
> involvement can be shown through allegations of personal
> direction or of actual knowledge and acquiescence.
> Allegations of participation or actual knowledge and
> acquiescence, however, must be made with appropriate
> particularity.

Rode, 845 F.2d at 1207.

Based on this Court's review of the complaint, there are no alleged facts

which would establish that Superintendents Horn and Beard had any personal

involvement or acquiescence in either the treatment of Still at SCI-Retreat or the

administrative review of his grievances.  Since it is apparent that the claims against

those Defendants are solely based on their supervisory capacities within the DOC,

under the standards announced in Capone and Rode, they are both entitled to an entry

of dismissal.

The Corrections Defendants next argue that the Plaintiff has not stated a

viable claim of deliberate indifference.  As recognized in Estelle v. Gamble, 429 U.S.

97 (1976), the government has an "obligation to provide medical care for those whom

it is punishing by incarceration."  Id. at 103.  A constitutional violation, however,

does not arise unless there is "deliberate indifference to serious medical needs of

17

prisoners" which constitutes "unnecessary and wanton infliction of pain." Id. at 104

(citation omitted). The proper analysis for deliberate indifference is whether a prison

official "acted or failed to act despite his knowledge of a substantial risk of serious

harm." Farmer v. Brennan, 511 U.S. 825, 841 (1994).

Thus, a complaint that a physician or a medical department "has been

negligent in diagnosing or treating a medical condition does not state a valid claim of

medical mistreatment under the Eighth Amendment [as] medical malpractice does not

become a constitutional violation merely because the victim is a prisoner." Estelle,

429 U.S. at 106. Where a prisoner has actually been provided with medical treatment,

one cannot always conclude that, if such treatment was inadequate, it was no more

than mere negligence. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993). It is

true, however, that if inadequate treatment results simply from an error in medical

judgment, there is no constitutional violation. See id.

The  Court of Appeals for the Third Circuit in Durmer established that a

non-physician defendant cannot be considered deliberately indifferent for failing to

respond to an inmate's medical complaints when he is already receiving treatment by

the prison's medical staff. Likewise, a prison health care administrator "cannot be

deliberately indifferent when an inmate is receiving care from a doctor." Thomas v.

Zinkel, 155 F.Supp. 2d 408, 413 ( E.D. Pa.  2001).

18

None of the Corrections Defendants is identified as being a physician. Furthermore, the record of this action clearly demonstrates that following his accident, the Plaintiff was placed under the care of the prison's medical staff and was referred to Dr. Raklewicz the following day. There are no facts alleged which would show that the return of Still to his cellblock after the taking of x-rays was contrary to a medical directive or prescribed course of treatment. Consequently, under the standards discussed in Durmer and Thomas, the remaining Corrections Defendants, who are all non-physicians, are entitled to an entry of dismissal with respect to Still's sole, exhausted claim of being improperly returned to his cellblock.

It is additionally noted that the mere fact that some Corrections Defendants responded to Still's grievances does not support an inference that they were deliberately indifferent to his medical needs.[9] Those officials were entitled to rely upon the advice of the health care professionals. There are simply no allegations that

---

[9] Moreover, there is no constitutional right to a grievance procedure. See Jones v. North Carolina Prisoners' Labor Union, Inc., 443 U.S. 119, 137-38 (1977)(Burger, C.J., concurring)("I do not suggest that the [grievance] procedures are constitutionally mandated."). Accordingly, to the extent Plaintiff contends that the Corrections Defendants violated his constitutional rights by not taking corrective action on his medical complaints, said allegations fail to state a claim upon which relief may be granted. See Johnson v. Harding, Civil No. 3:CV-99-977, slip op. at p. 8 (Feb. 29, 2000)(Vanaskie, C.J.).

any of the Corrections Defendants improperly interfered with the health care professionals or adversely influenced the care and treatment Still received.

In conclusion, under the standards announced in <u>Durmer</u> and <u>Thomas</u>, there is no basis for an Eighth Amendment claim against any of the Corrections Defendants. Pursuant to the above discussion, the Corrections Defendants' motion to dismiss will be granted.  An appropriate Order will enter.[10]

**IT IS HEREBY ORDERED THAT:**

1.  Defendants James Updike, P.A. and Renato Diaz, M.D.'s motion to dismiss (Record document no. 13) is granted.

2.  The Corrections Defendants' motion to dismiss (record document no. 10) is granted.

3.  Plaintiff's motion for default judgment (Record document no. 24) is denied.

4.  The Clerk of Court is directed to close the case.

---

[10]  In light of the conclusions announced herein, a discussion as to the merits of the Corrections Defendants' qualified immunity argument is not required.

5.    Any appeal from this Order will be deemed frivolous, without

probable cause and not taken in good faith.


_____
JOHN E. JONES III
United States District Judge

21

# Mercy Suburban Hospital
2701 DeKalb Pike • Norristown, PA 19401 • (610) 278-2100

## RADIOLOGY CONSULTATION REPORT

DP4246

| D.M. Bolden, D.O. (Chairman) | S.W. Thai, D.O. | M.J. Zappitelli, D.O. | B. Marks, D.O. | S. Wable, M.D. | A. Maidment, Ph.D. (Radiologic Physicist Consultant) |

Peay, Stratton  OP

11873049        X 223047

Age: 25        DOB: 11/04/76

Graterford Correctional Institution

Att: Dr. Smith

P.O. Box 44

Graterford, PA 19426

Diagnostic Reports
RALPH SMITH, M.D.
MEDICAL DIRECTOR
Name: _____
Date / Time: 10 7 22  1030
A         N      NCS

**REFERRING DIAGNOSIS/COMPLAINT:**        Pain

10/09/02

## BARIUM ENEMA

A survey film of the abdomen shows air throughout the colon with no definite distention or obstruction. An opaque density was noted adjacent to the head of the left femur which may represent a bullet fragment.

With fluoroscopic control the colon canalized to the level of the cecum showing an extremely elongated tortuous and redundant sigmoid as well as redundancy with the hepatic and splenic flexure levels.

Reflux was noted in the distal ileum.

Double air contrast study shows satisfactory distensibility. The appendix was visualized and appeared tortuous containing fecal debris.

## CONCLUSION

1.    Extremely redundant and tortuous type colon showing no definite filling defects or obstruction or diverticula.

2.    Visualized appendix.

*Michael J. Zappitelli, D.O.*

MZ:hea

D/T: 10/09/02                Michael Zappitelli, D.O.



PERTINENT HISTORY IS IMPORTANT FOR OPTIMAL INTERPRETATION OF YOUR IMAGING REQUESTS



02 DEC 19 PM 1:05

COMMONWEALTH OF PENNSYLVANIA
**OFFICE OF ATTORNEY GENERAL**

MIKE FISHER
ATTORNEY GENERAL

## MEMORANDUM

SUBJECT:    Stratton Neal Peay v. Donald T. Vaughn, et al.
            Civil Action No. 02-2688

TO:         Thomas Rowlands, Supervisor of Records
            State Correctional Institution
              at Graterford
            P.O. Box 244
            Graterford, PA 19426

RECEIVED
JAN 9 - 2003
OFFICE OF ATTORNEY GENERAL
LITIGATION SECTION

FROM:       Edward C. Wright
       Too  Deputy Attorney General

DATE:       December 16, 2002

I am requesting *any and all* Documents on file from September 23, 2002 until present in reference to Stratton Neal Peay, #DP-4246, currently housed there at State Correctional Institution at Graterford.    ECW

If you have any questions, please do not hesitate to call me at (215) 560-2141.

no meds
Provided
though
subsequent
to  9/23/02

- mailed copies on 1/8/03
aet

ECW:obb

COPY

1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2

                       *    *    *

3

4    STRATTON NEAL PEAY,          :    CIVIL ACTION
                   Plaintiff,     :
5            - vs -              :
     DONALD VAUGHN,  et al.,     :
6              Defendants. :    NO.  02-2688
7                      *    *    *

8

9

10

11              Oral deposition of STRATTON NEAL PEAY,
12    taken at SCI GRATERFORD, P.O. Box 244, Graterford,
13    Pennsylvania, 19426, on Monday, June 2, 2003, beginning
14    at approximately 10:30 a.m., before Lisa M. Cooper,
15    Court Reporter.

16

17

18

19

                       *    *    *

20

               PRECISION REPORTING, INC.
21          230 South Broad Street - 11th Floor
             Philadelphia, Pennsylvania  19102
22                   (215)  731-9847
                  1-800-528-3060
23    2149 Galloway Road          1134 Parliament Way
     Bensalem, PA  19020          Thorofare, NJ  08086
24    (215) 731-9847              (856) 848-4978

DEFENDANT'S
EXHIBIT
G

```
 1      A P P E A R A N C E S :

 2

                ANGUS LOVE, ESQUIRE
 3              Pennsylvania Institutional Law Project
                924 Cherry Street, Suite 523
 4              Philadelphia, Pennsylvania  19107
                -- Representing the Plaintiff

 5

 6              EDWARD C. WRIGHT, ESQUIRE
                DEPUTY ATTORNEY GENERAL
 7              Litigation Section
                Office of Attorney General
 8              21 South 12th Street, 3rd Floor
                Philadelphia, Pennsylvania  19107
 9              -- Representing the Defendant

10

                ALAN S. GOLD, ESQUIRE
11              Gold, Butkovitz & Robins, P.C.
                7837 Old York Road
12              Elkins Park, Pennsylvania  19027
                -- Representing the Defendant

13                            *     *     *

14
        A L S O   P R E S E N T :
15

                Joe DeFelice
16              C.O. Hollis
                C.O. Washington

17

18

19

20

21

22

23

24
```

PRECISION REPORTING, INC.

PROCEEDINGS

1

2                          *    *    *

3              (It is hereby stipulated by and

4          among counsel for the respective parties that

5          signing, sealing, certification, and filing

6          are waived, and that all objections, except

7          as to the form of the question, are reserved

8          until the time of trial.)

9                          *    *    *

10                    STRATTON NEAL PEAY,

11          after having been first duly sworn, was

12          examined and testified as follows:

13                          *    *    *

14                      EXAMINATION

15                          *    *    *

16     BY MR. WRIGHT:

17     Q        Good morning, Mr. Peay.  My name is Edward

18     Wright.  I'm from the Office of Attorney General,

19     representing defendants Superintendent Vaughn, Julie

20     Knauer and Sergeant Thomas in the action you filed here

21     today.  Pursuant to rule 30A I'll be taking your

22     deposition, and I just want to go over a few ground

23     rules with you.  Have you ever been through a

24     deposition before?

```
 1    A          No.

 2    Q          Okay.  I want to explain to you what is going

 3    to happen here today.  I'm going to ask you questions

 4    and I would like you to answer them to the best of your

 5    recollection, do you understand that?

 6    A          Yes.

 7    Q          Make sure that your answers are verbal and

 8    not nods, because we have to make sure that the

 9    stenographer is able to put that down, okay?

10    A          All right.

11    Q          If you don't understand a question, please

12    let me know, otherwise we're going to assume that you

13    do understand the question.

14    A          All right.

15    Q          If you don't know the answer to a question or

16    don't recall, please don't guess at an answer, do you

17    understand that?

18    A          Yes.

19    Q          If you answer a question and then later

20    remember something that relates to an earlier question

21    that you forgot to answer, you can certainly let me

22    know you would like to amend that answer.  Do you

23    understand that?

24    A          What did you say?
```

1    Q        If there is an answer to a question that you

2    remember ten minutes after I ask the question, you can

3    feel free to jump in and let me know you have something

4    to add.

5    A        Okay.

6    Q        I want you to understand that you are under

7    oath here.  And the testimony that you give here today

8    to the stenographer can be used in trial, do you

9    understand that?

10   A        Yes.

11   Q        Do you have any problems that are going to

12   interfere with your ability to concentrate or answer

13   any of my questions today?

14   A        Yes.

15   Q        What would those problems be?

16   A        My medical condition and my mental

17   condition.  I'm extremely emotionally stressed, you

18   know what I'm saying.  I've been assaulted.  You know,

19   I'm being denied surgery, you know what I'm saying.

20   You know, I'm hurt, you know what I'm saying.

21   Q        Okay.  Are you currently taking any

22   medications?

23   A        Yeah.

24   Q        Do you know the names of those medications?

1    A         Colace.   And something -- some type of fiber

2    laxative.

3    Q         Okay.  You are not under any medication that

4    will interfere with your ability to understand what I'm

5    saying?

6    A         I hear you.

7    Q         Are you under the influence of alcohol or

8    narcotics of any kind?

9    A         No.

10   Q         Do you understand everything that I've

11   explained to you thus far?

12   A         Yes.

13   Q         Okay.  Could you please state your name and

14   spell your name for the record?

15   A         Stratton Peay.  S-T-R-A-T-T-O-N, P-E-A-Y.

16   Q         Your date of birth?

17   A         11/4/76.

18   Q         And your place of birth?

19   A         Philadelphia, PA.

20   Q         Do you read and understand English?

21   A         Yes.

22   Q         How far did you go in school?

23   A         Tenth grade.

24                   MR. GOLD:  I didn't hear that answer,

1               I'm sorry.  Tenth grade?

2               THE WITNESS:  Yeah.

3               MR. GOLD:  I'm sorry.

4               THE WITNESS:  Don't worry about it.

5     BY MR. WRIGHT:

6     Q        Mr. Peay, I want to talk to you about the

7     complaint that you filed in this matter.  And, again, I

8     represent Superintendent Vaughn, defendant Julie Knauer

9     and Sergeant Thomas.  And Mr. Gold, he represents the

10    doctor in this case.  I want to ask you about your

11    complaint.  You indicated that you complained to

12    Sergeant Thomas that you felt threatened by your cell

13    mate, Mr. Sanders?

14    A        I didn't file that complaint.  My lawyer --

15    the lawyer filed that complaint.

16    Q        Okay.

17               MR. WRIGHT:  Could we go off the record

18          for a minute.

19                         *    *    *

20               (Whereupon, a discussion off the record

21          was held.)

22                         *    *    *

23    BY MR. WRIGHT:

24    Q        You indicated that you felt threatened by

1    your cell mate?

2    A        No.

3    Q        Your cell mate did not threaten you?

4    A        I never indicated nothing like that.

5    Q        I'm sorry?

6    A        I never indicated that.

7    Q        I'm sorry, I couldn't hear you.

8    A        I never said that.

9    Q        So you were not threatened by your cell mate?

10   A        I ain't going to say that.  I said I never

11   said that I was threatened.  You want to know what I

12   told him?

13   Q        Could you explain to me what role you believe

14   Sergeant Thomas has in your lawsuit?

15   A        I asked him, you know what I'm saying, not to

16   put a person in my cell, you know what I'm saying.

17   Q        You asked Sergeant Thomas that?

18   A        Yeah.  And I told the person, you know what

19   I'm saying, that he put in my cell, to ask him to move

20   him to a different cell, you know what I'm saying,

21   because I was sick, you know what I'm saying.

22   Q        When you say sick, what were you sick from?

23   A        From my medical problem.  I got medical

24   problems, man, you know what I'm saying, in my abdomen,

1    man.

2    Q        **When do you recall having these conversations**

3    **with Sergeant Thomas?**

4    A        As soon as they put him in the cell.  As soon

5    as they put him in the cell with me.

6    Q        **Do you remember when that would have been?**

7    **Would that have been August of 2001, is that a correct**

8    **statement?**

9    A        Yes.  First day.  As soon as he tried to put

10    him in my cell I told him, you know what I'm saying.  I

11    told the boy, I said, go tell them to move him to a

12    different cell, you know what I'm saying.  I'm sick and

13    you don't need to be in here with me, you know what I'm

14    saying.  He went to the boy, he went to the sergeant.

15    And he came back and said the sergeant said, "Fuck me.

16    I ain't nobody."  So I went up there and I told him.

17            I went up there and talked to him myself.  I

18    said listen, you know what I'm saying, I'm sick, you

19    know what I'm saying, don't put this person in my

20    cell.  Move him to a different cell, you know what I'm

21    saying.

22    Q        **What did Sergeant Thomas say?**

23    A        I can't even recall.  He didn't move him,

24    though.

1    Q        What did you do when you realized that your

2    cell mate was not leaving your cell?

3    A        Huh?

4    Q        At some point you realized he was going to be

5    your cell mate.

6    A        Yeah.

7    Q        Against your wishes.

8    A        Yeah.

9    Q        What did you do then?

10   A        There was nothing I could do.

11   Q        Did you grieve that situation?

12   A        At that time I knew nothing about grievances.

13   Nobody explained no grievances to me.  I never even

14   knew what a grievance was.

15   Q        Did you fill out a request to staff about

16   this situation, though?

17   A        No, I didn't know that I could do that.  I'm

18   saying they intentionally put the boy in my cell to

19   harass me, you know what I'm saying.  So there wasn't a

20   whole lot of me putting in any paperwork in order for

21   something to be done, because they weren't going to do

22   nothing anyway.

23   Q        Did you talk to Sergeant Thomas about this

24   more than once, if you recall?

```
 1   A            No.

 2   Q            You just talked to him one time about it?

 3   A            Yeah.

 4   Q            At some point you believe that your cell mate

 5   assaulted you?

 6   A            Yes.

 7   Q            How soon after that, after him being placed

 8   in your cell?

 9   A            I mean, it was like -- I mean, listen, man,

10   it happened, you know what I'm saying.  You know what

11   I'm saying, like a couple days after that.  Like two,

12   three days.

13   Q            Did you know Mr. Sanders before he was placed

14   in your cell?

15   A            No.

16   Q            When would this assault have taken place, if

17   you recall?

18   A            What do you mean?

19   Q            In August of 2001?

20   A            Yeah.

21   Q            Would that be around the time?

22   A            Yeah.

23   Q            What made you believe that you were

24   assaulted?
```

1   A       I mean, it ain't no belief, it's a fact, you

2   know.  It ain't no belief.  It ain't a belief, it's

3   fact.

4   Q       **Okay.  You make an allegation that you were**

5   **drugged?**

6   A       Yeah.

7   Q       **What makes you believe -- why do you say you**

8   **were drugged?**

9   A       Because I never woke up, you know what I'm

10   saying, during the situation, you know what I'm saying.

11   That's one of the reasons.  And as I was reflecting

12   back to the situation, you know, I had a -- I don't

13   know about that particular night, but I know he had

14   given me something to drink.

15   Q       **When you say he?**

16   A       The boy that was in my cell.

17   Q       **He had given you something to drink?**

18   A       Yeah.

19   Q       **What happened then?**

20   A       Nothin', you know what I'm saying.  I ain't

21   saying something happened then.  I'm just saying.

22   Q       **I mean, you went to sleep?**

23   A       No.  Listen.  After this situation happened,

24   you know what I'm saying, as I was thinking about, you

1    know, the situation that happened, about the rape, you

2    know what I'm saying, I wondered to myself why didn't I

3    wake up, you know what I'm saying, during that

4    situation, you know what I'm saying.  So I had to

5    think.  I was like, I wonder, is that the same day

6    that, you know what I'm saying, he gave me something to

7    drink that could --

8    Q        You were trying to figure it out as you

9    thought back on it?

10   A        Yeah.

11   Q        Okay.  Did you report the assault to anyone?

12   A        Yeah.

13   Q        Who did you report it to?

14   A        I reported it to the warden.  To the

15   C.H.C.A --

16   Q        Knauer?

17   A        Yeah.  A whole lot of people, you know what

18   I'm saying.  Counselors.  They knew what happened to me

19   and they didn't do nothing.  Like I said, they got --

20   they had it done, you know what I'm saying.

21   Q        You believe that --

22   A        I feared for my life in the jail, you know

23   what I'm saying.  When I told them they didn't do

24   nothing about it.  Everybody thought it was a joke, you

1  know what I'm saying.  He was sending off all types of

2  signals and laughing about the shit, you know what I'm

3  saying.  Excuse my language.  Laughing about it and all

4  of that.  So, you know what I mean, they knew what

5  happened to me.  They had the names.

6              MR. GOLD:  Who was laughing?  The guards

7          were laughing?

8              THE WITNESS:  Yeah.

9  BY MR. WRIGHT:

10  Q          Did you ever report this to internal

11  security, this assault?

12  A          Yes.

13  Q          Do you remember when you would have done

14  that?

15  A          No, I can't recall, you know what I'm saying.

16  But they knew, you know what I'm saying.  You know what

17  I'm saying.  They had it done.  They knew the first day

18  it happened.

19  Q          Did you ever grieve this incident?

20  A          Yeah.  Hold on.  I don't know if I grieved it

21  or not.  I don't know.

22  Q          You mentioned that you told Julie Knauer

23  about this?

24  A          Yeah.

1    Q        Would you put that in writing?

2    A        I said look, I told her like this -- I told

3    the warden about it, right.

4    Q        Superintendent Vaughn?

5    A        Yeah.  He write me back with a joke, you know

6    what I'm saying.  Like making the situation out of a

7    joke.

8    Q        So you wrote to Superintendent?

9    A        Yeah.  And look, they put me in a single

10   cell.  See, they knew what happened, right, and they

11   put me in a single cell, you know what I'm saying, with

12   nobody else.  I was in cells before with people, you

13   know what I'm saying.  And all of a sudden I'm in a

14   cell by myself and they are fabricating all of these

15   misconducts trying to make it seem like, you know what

16   I'm saying, I'm a violent person, to keep me in a cell

17   by myself, you know what I'm saying.

18            They got me down here the whole time, or due

19   time of 2008, based upon a misconduct that they

20   fabricated.  Assault.  You know what I'm saying, I

21   don't assault no guards.  I don't assault guards.  I'm

22   trying to go home, you know what I'm saying.  What

23   would I look like assaulting the guards?

24   Q        You reported this to internal investigation?

1    **Do you know if their investigation was ever conducted?**

2    A          Oh, listen, if they had a gun, they ain't

3    doing nothing about it.  You know they ain't doing

4    their job.  When I told the guards they started

5    partying, man.  It was funny to them, you know what I'm

6    saying.

7    Q          **Do you know any of these guards' names?**

8    A          Yeah.  C.O. Vaughn, you know what I'm saying.

9    A whole lot of them, you know what I'm saying.

10   Q          **Anyone else besides C.O. Vaughn?**

11   A          All the staff, man.  Everybody that works

12   there.

13   Q          **What unit were you in at this time, do you**

14   **recall?**

15   A          On L Unit.  On R.H.U., you know what I'm

16   saying.

17   Q          **This is where it happened?**

18   A          No, it happened on D Block.

19   Q          **The assault happened on D Block?**

20   A          Yeah.

21   Q          **The guards that were making fun of you when**

22   **you were in the L unit after the fact?**

23   A          No.  It was on D Block too.

24   Q          **Did you have any problems as a result of this**

1    **assault, any physical problems?**

2    A          Listen, I ain't going to say that.  I ain't

3    going to say that.  I ain't going to say I did, I ain't

4    going to say I didn't, you know what I'm saying.  I

5    know I brought it to their attention and nothing was

6    done about it, you know what I'm saying.  Just like I

7    need surgery right now, you know what I'm saying.  I'm

8    hurt.

9    Q          **What do you need the surgery for?**

10   A          Listen, I can't even go to the bathroom.  I

11   could be dying here, you know what I'm saying.  I could

12   die and they ain't doing what they supposed to be

13   doing, you know what I'm saying.  I'm hurt.  They just

14   knocked my tooth out, you know what I'm saying.  Broke

15   other teeth, you know what I'm saying.  My knee might

16   be broke.  Ain't nothing being done about it, you know

17   what I'm saying.

18              They assaulted me for no reason while my

19   hands was in handcuffs behind my back.

20   Q          **Who is "they"?**

21   A          The guards.  C.O. Pitts, C.O. Dombrowski,

22   C.O. Przybylowski, and C.O. Dobson.

23   Q          **Is this related to the lawsuit that we're**

24   **here for today?**

1   A          Yeah.  It's retaliation, you know what I'm

2   saying, based on my complaint and they are trying to

3   frame me.

4   Q          **Your complaint about what?**

5   A          This complaint right here.  And they trying

6   to frame me.

7   Q          **So as a result of filing this lawsuit you**

8   **think the guards -- you are saying the guards are doing**

9   **things to you, is that --**

10  A          Listen, they had me assaulted.  They had me

11  raped, right.

12  Q          **When you say "they"?**

13  A          The guards, you know what I'm saying.  I

14  filed a complaint, you know what I'm saying.  They put

15  me in the hole.  And now, you know what I'm saying, you

16  know, beings though I filed a complaint, you know what

17  I'm saying -- I'm an innocent man on a different

18  situation and they made, you know what I'm saying.

19  They trying to frame me, you know what I'm saying.

20          So they trying to come down on me about that,

21  you know what I'm saying, beings that I filed a

22  complaint.  They want to beat me up.  They think that's

23  going to change my innocence, you know what I'm saying.

24  Like that's going to change me from doing what I have

1    to do to get out of jail, you know what I'm saying.

2    Q        Did you have any -- after you were assaulted,

3    did you have any physical problems that you didn't have

4    before you were assaulted?

5    A        No, I ain't going to say that.

6    Q        You talk about you had abdominal pain?

7    A        Yeah.

8    Q        After the fact of the assault?

9    A        That was before that too.  That was before

10   that.

11   Q        You had abdominal pain before?

12   A        Yeah.  Like I said, I ain't file that

13   complaint.

14   Q        When would you say the abdominal pain

15   began --

16   A        Listen --

17   Q        -- to the best of your recollection?

18   A        Listen, I was having problems, you know what

19   I'm saying.  When I was going to sick call they wasn't

20   doing nothing about it.  See, that's another thing I'm

21   talking about.  They knew I was sick and they

22   intentionally denied me medical care.

23                MR. GOLD:  Who's "they"?

24                THE WITNESS:  Your client.  Ralph W.

1        Smith, the medical director.  The doctors and

2        all of them, you know what I'm saying.  I was

3        so sick, right.  Like, as far as being as

4        though my intestines messed up, right, I

5        can't -- I be having leaky stool problems,

6        you know what I'm saying.  And bugs and stuff

7        was flying on me and everything.

8            And I was going to sick call every day

9        and they would look at me and tell something

10       was wrong with me, but they was trying to

11       obstruct justice trying to frame me for

12       something.  Trying to keep me framed for

13       murder, you know what I'm saying, so they

14       denied me -- they was intentionally denying

15       my medical problems, you know what I'm

16       saying.

17           Thinking I'm lying about something I'm

18       innocent for, you know what I'm saying.

19  BY MR. WRIGHT:

20  Q        When did your leaky stool problems begin?

21  Was that before the assault or after the assault, or do

22  you recall?

23  A        You know what I'm saying, it was after the

24  assault, but it ain't the assault that happened.   I

1    ain't going to say it wasn't the assault.

2    Q          It wasn't the assault?

3    A          Uh-uh.

4    Q          You said you were going to sick call every

5    day?

6    A          Yes.  Every day.  Every day.  They knew

7    something was wrong and they did nothing about it.

8    Q          So you were seeing medical staff, is that

9    correct?

10    A          I was seeing medical staffed based upon the

11    fact that I was putting sick call slips in to see

12    medical staff.  But when I was going to see medical

13    staff, they weren't doing what they supposed to do.

14    Q          Now, my clients that I represent are not

15    doctors.  So you were being allowed to see the medical

16    -- so you were being allowed to see the doctors, is

17    that your statement here today?

18    A          No.  Listen, no.  Because, listen, right now

19    they denying me the access to doctors.

20    Q          When you say they --

21    A          P.A. Michael Pazzano, you know what I'm

22    saying.  Like any day I sign up for sick call, like

23    this knee problem, you know what I'm saying.  My knee

24    might be broken.  When they assaulted me on the 8th,

1    right, last month, the 8th of April, right, they came

2    to my cell, one doctor came to my cell, right, it was

3    supposed to be -- no, look, the doctor came to the cell

4    that I'm in, whatever, right, supposed to be examining

5    my knee or whatever, right, so he came to the cell and

6    examined my knee a little bit and he was going to put

7    me down for x-ray, right, but I told him, you know what

8    I'm saying, I'm not going to go up there, due to the

9    assault situation.

10            I didn't tell him about the assault, but all

11   the staff already knew.  So I ain't going to go up

12   there, because they was acting like they was going to

13   transfer me, you know what I mean.  Because I've been

14   asking to be transferred for a long time, because I

15   knew they was trying to assault me, you know what I'm

16   saying.

17            So, look, they come to the cell, you know

18   what I'm saying, and examined my knee a little bit.

19   Ever since the 8th my knee been messed up, you know

20   what I'm saying.  Listen, my knee, the cap of my knee,

21   my left knee was totally, you know what I'm saying,

22   moved from its original position, you know what I'm

23   saying.  Like, I'm in pain and everything, you know

24   what I'm saying, and ain't nobody x-rayed me.

1    Q         Mr. Peay, I understand you have a problem

2    with your knee.

3    A         My knee might be broke, man.  This got

4    something to do with this situation.

5              MR. GOLD:  You need to file another

6              complaint about it, if you want.

7    BY MR. WRIGHT:

8    Q         See, we're here for the facts --

9    A         They jumped me.  They hurt me, man, you know

10   what I'm saying.  That's why I had to file the

11   complaint, man.

12   Q         I understand.  I would like to focus on what

13   you filed here, and I understand there are other issues

14   and I know they are important to you, and they are

15   important, but I would like to focus on what you filed

16   in your complaint that we're dealing with today.  And

17   basically, from my reading of your complaint, it

18   alleges injury as a result of the assault, a problem

19   with your rectum, with your abdomen, constipation, and

20   nausea.

21              And, if we could, and, again, I understand

22   those things are important to you, but I would like to

23   try to focus on just those issues, if we could, here

24   today.  Again, I don't represent the doctors.  The

1    people that I represent would be the health care

2    administrators, Julie Knauer and the superintendent,

3    and they are not doctors.

4              Mr. Gold -- you will have an opportunity to

5    speak with Mr. Gold, he will ask you some questions

6    a little bit later.  You previously just indicated to

7    me that you had a leaky stool problem, but that was not

8    a result of the assault, is that an accurate statement?

9    A           No.  I ain't going to say that.

10   Q          Okay.

11   A           I don't know what it is, you know what I'm

12   saying.

13   Q          You have problems with your rectum, that is

14   the result of the assault?

15   A           No, I said I ain't going to say that.  I

16   ain't going to say that.  I ain't going to say it is, I

17   ain't going to say it ain't.  Ya'll keep trying to play

18   around about me being assaulted, you know what I'm

19   saying.  I was sexually assaulted.  I reported it to

20   your client, your clients, you know what I'm saying,

21   and they ain't do what they supposed to do, you know

22   what I'm saying.

23   Q          You indicated that you had repeatedly asked

24   the Correctional Health Care Administrator, Julie

1    Knauer, to be seen by doctors for all the problems that

2    you had.  Did she ever deny you the opportunities to

3    seek medical treatment?  Did she ever tell you, "No,

4    I'm not going to send you to the doc unit"?

5    A        I mean, listen, I ain't going to say that she

6    ever told -- she -- I can't recall, man.  Because

7    listen, I tell her all the time, you know what I'm

8    saying, I have a medical problem, I need help.  Like, I

9    can't -- you know, my condition is so bad, right.  Like

10   I've been -- this year I've only been to recreation

11   outside in the yard twice, you know what I'm saying.

12   Like, I got to stay in the cell all the time, you know

13   what I'm saying, based on me needing surgery, you know

14   what I'm saying.

15   Q        Do you know if Superintendent Vaughn ever

16   refused you medical care?

17   A        I mean, they didn't do what they supposed to

18   do, you know what I mean.  That's refusing me medical

19   care, you know what I'm saying.  Why would I go to the

20   doctor and I tell the doctor I need something and he

21   tells me -- he blatantly tells me no, you know what I'm

22   saying.

23   Q        Mr. Peay --

24   A        I reported it to your client.  I reported it

1    to the warden and he tells me he can't do nothing about

2    it.

3    Q          So that's what makes you believe.  Okay.

4    A          No, just like I said, when I reported that

5    rape to him, you know what I'm saying, he was just

6    acting like it was a joke.  Writing back 20 letters,

7    you know what I'm saying, with little messages on there

8    like it's a game, you know what I'm saying.

9    Q          Just so I have it straight, Sergeant Thomas

10   is not --

11   A          Just like -- listen, just like I have a

12   request slip, like I said, they put me in the cell by

13   myself after that situation happened.

14   Q          After the situation.

15   A          Yeah.  They put me under a title that don't

16   even fit me.

17   Q          What title was that?

18   A          Talking about I assault people.  Like I'm an

19   aggressive person, you know what I'm saying.  One of

20   the reasons why they put me under the status was

21   because of the assault, because I was raped, you know

22   what I'm saying.

23   Q          Are you Z coded presently?

24   A          Yeah, that's what they did to me.  They put

1    me under the Z code, you know what I'm saying.  So now,

2    when I wrote the staff about the situation, you know

3    what I'm saying, like, what is they doing putting me in

4    a cell by myself and all of that.  They write me back

5    something like, "Yeah, we heard they came to your cell,

6    with emphasis on came, like -- you know what I mean.

7    Q        Do you have any of those documents --

8    A        Like "come" and all of that, you know what I'm

9    saying.

10   Q        -- in your possession?

11   A        Yeah, my lawyer's got them.

12   Q        Okay.  Now, just so I have it straight,

13   Sergeant Thomas, my understanding is that your beef

14   with Sergeant Thomas is that he placed this gentleman

15   in your cell.  Sergeant Thomas didn't have anything to

16   do with you getting medical care, or is that an

17   incorrect statement?

18   A        It's a conspiracy, you know what I'm saying.

19   They're all involved, you know what I'm saying.  You

20   see all of this movement he is doing over here, this

21   correctional officer over here.  (Indicating.)

22            MR. GOLD:  So these guards are involved

23            in the conspiracy?

24            THE WITNESS:  Yeah, yeah, yeah, yeah.

1      Don't you see my -- look at my teeth, man.

2            MR. GOLD:  So these guards were involved

3      in the conspiracy?

4            THE WITNESS:  Yeah, yeah.

5            MR. GOLD:  How about the guard that was

6      just here?

7            THE WITNESS:  Yeah, he involved with it

8      too, you know what I'm saying.  You want to

9      see my teeth?  You want to see what they done

10     to my knee, you know what I'm saying.  You

11     act like it's a joke.

12           MR. GOLD:  Were these guards involved in

13     the conspiracy to deny you medical care too?

14           THE WITNESS:  Yeah, yeah.  They mess

15     with me every day.  They harass me.  Put

16     stuff in my food.  My heart was hurting for

17     three days, man.  I thought I was going to

18     die, based upon they put something in my

19     food, man, that was messing with my heart,

20     you know what I'm saying.

21           MR. GOLD:  Is there any guard here who

22     isn't involved in the conspiracy against you?

23           THE WITNESS:  No.  I fear for my life

24     with all staff here.  I've been asking them

1            to transfer me since 2002, man.  This is

2            2003.  Before my teeth was knocked out -- my

3            tooth was knocked out, my other teeth

4            shifted.  My knee is possibly broke.  I asked

5            them many times to transfer me and they ain't

6            transfer me, and, you know what I'm saying,

7            look at me now.

8    BY MR. WRIGHT:

9    Q        Mr. Peay, if we could try to focus on the

10   injuries that you allege in your complaint.  I

11   understand you have a lot of concerns and I want to try

12   to keep it focused on the complaint that you filed.

13   Now, Julie Knauer is a correctional health care

14   administrator.  She is the person that you talk to when

15   you think you need medical treatment, is that correct?

16   A        Yeah, yeah.  I guess so.

17   Q        Did you have an opportunity to talk to her

18   about --

19   A        The person --

20   Q        About getting medical treatment.  Did you

21   ever write to her?

22   A        Yeah, all the time.

23   Q        Did she ever -- what was her response?

24   A        Nothing.  She never said nothing in my favor.

1    Q        Did she ever review your records in telling

2    you what her answer was?

3    A        I don't know what she did, because, listen,

4    every time -- you know how it's the blue code of

5    silence, man.  The blue wall of silence.  You know,

6    whatever staff do, that's what staff -- you know what I

7    mean.  They all together, man.  You know, I'm serious,

8    though, man.  They got me -- they pumping harmful gas

9    in my cell that make me laugh at things that I

10   shouldn't be laughing at.

11   Q        Now, your -- part of your main complaint is

12   that you do not believe you are receiving adequate

13   medical treatment, is that correct?

14   A        I'm not, no.

15   Q        Okay.  Do you believe that Superintendent

16   Vaughn could personally give you medical treatment?

17   A        Yeah.  I mean, he can't -- he's not a doctor.

18   Q        How about Julie Knauer?

19   A        I'm saying, she oversees the doctors, these

20   nurses, all of that, right.  So if I'm telling him

21   every day that I can't travel, I feel like I'm dying,

22   I'm hurt, I need surgery, and he's telling me, there's

23   nothing he can do, because he's got to go off of what

24   they say, then he's not doing his job, because he's

1    hiring unprofessional people, you know what I'm saying.

2           Because I'm telling these doctors every day

3    that I'm hurting and surgery is a must for me.  I can't

4    travel nowhere.  That's a violation of my rights, man.

5    Q          So you were seeing doctors --

6    A          I'm in constant pain.

7    Q          -- frequently?  You've been seeing doctors

8    frequently?

9    A          Yeah.  Listen, I'm signing up for sick call

10   every day, man.  I'm telling ya'll, listen, they

11   intentionally denying me care, you know what I mean.

12   Man, I can't even go to the bathroom, right.  I can't

13   even move my bowels, man.  So, you know, if that ain't

14   a problem, I -- that's a problem, man.  They got me

15   taking laxatives, right.  They be having me taking

16   laxatives since 2001.  Listen, they be having me taking

17   laxatives since 2001.

18   Q          Before the assault or after?

19   A          Listen, ever since 2001, they got me taking

20   laxatives, right.  Now, all -- basically, like all the

21   laxative warnings that I read they say, if constipation

22   exceeds seven days, then consult a doctor, because it

23   may be a serious problem.  I know I got a serious

24   problem.  I can't go to the bathroom, so I have been

1    consulting them way past seven days.  This has been

2    like a year.

3              I'm telling them this is a serious problem,

4    man, and they trying to tell me it's constipation.

5    Come on, I don't supposed to get constipation.  I had

6    surgery before when I was on the streets, you know what

7    I'm saying.  I'm supposed to go to the bathroom.

8    Q         Surgery for what?

9    A         I had a hole in my stomach and in my

10   intestines, you know what I'm saying.

11   Q         Was this from the gunshot wound?

12   A         Yeah.

13   Q         When was this?  In 1996?

14   A         Yeah.  So, look, I'm supposed to go to the

15   bathroom without a problem, you know what I'm saying.

16   My stool supposed to be watery and now it's hard all

17   the time, you know what I'm saying.  It ain't even

18   hard.  I can't go to the bathroom.  They put something

19   in the coffee to make me go to the bathroom, you know

20   what I'm saying.

21             MR. GOLD:  Do the laxatives make you go

22        to the bathroom?

23             THE WITNESS:  No.  No.

24             MR. GOLD:  When was the last time you

1              moved your bowels?

2                  THE WITNESS:  I need help.

3                  MR. GOLD:  When was the last time you

4              moved your bowels?

5                  THE WITNESS:  Listen, I need help.

6                  MR. GOLD:  When was the last time you

7               moved your bowels?

8                  THE WITNESS:  On my own?

9                  MR. GOLD:  Period.  When was the last

10             time you moved your bowels?

11                THE WITNESS:  I mean --

12                MR. GOLD:  When was the last time you

13             moved your bowels, sir?

14               THE WITNESS:  Listen, when was the last

15             time that I told staff that I needed surgery

16             and they denied me surgery?

17               MR. GOLD:  I'm asking you a specific

18             question.  When was the last time you moved

19             your bowels?

20               THE WITNESS:  Listen, you trying to be

21             funny, you know what I'm saying.

22               MR. GOLD:  I'm not trying to be funny.

23             I'm trying to find out the nature of your

24             condition.

1          THE WITNESS:  I need surgery, man.

2          MR. GOLD:  Who told you you needed

3     surgery?

4          THE WITNESS:  I know I need surgery.

5          MR. GOLD:  How do you know?

6          THE WITNESS:  Because I know.  I can't

7     go to the bathroom.

8          MR. GOLD:  So your real problem with Dr.

9     Smith is that he won't authorize surgery?

10          THE WITNESS:  No.  Your client had

11     something to do with me being raped, you know

12     what I'm saying.

13          MR. GOLD:  Okay.  What did he do?  Did

14     he rape you?

15          THE WITNESS:  No, he probably had it

16     done.

17          MR. GOLD:  How do you know that?

18          THE WITNESS:  Because when I was talking

19     to him about my medical problems he said some

20     sexual comments to me that was inappropriate,

21     man.

22          MR. GOLD:  What sexual comments did he

23     make to you?

24          THE WITNESS:  When I told him, you know

1    what I'm saying, I had a medical problem, he

2    tried to do some -- he tried to stick his

3    hands somewhere that they don't supposed to

4    be, you know what I'm saying.

5              MR. GOLD:  It wasn't part of the

6    examination?

7              THE WITNESS:  No.

8              MR. GOLD:  Where did he stick his

9    hands?

10             THE WITNESS:  I said he tried to.

11             MR. GOLD:  Where did he try to?

12             THE WITNESS:  In my -- in my, you know

13   what I'm saying.

14             MR. GOLD:  In your what?

15             THE WITNESS:  Come on.

16             MR. GOLD:  Up your rectum?

17             THE WITNESS:  Yeah.  So I told him, no,

18   I ain't doing that.

19             MR. GOLD:  Weren't you complaining to

20   him about a rectum problem?

21             THE WITNESS:  No.

22             MR. GOLD:  You never complained to him

23   about a rectum problem?

24             THE WITNESS:  Yeah, but that wasn't the

1              problem that I was complaining to him about

2              that day.  And see, look, when I brought it

3              to his attention he got all excited and tried

4              to start a fight with me, right.  He tried

5              to get me to swing on him.

6    BY MR. WRIGHT:

7    Q         Dr. Smith?

8    A         Yeah.  So I left the room.  I was like, I

9    mean, come on, man.

10             MR. GOLD:  Any witnesses to that?

11             THE WITNESS:  I wasn't going to fall

12             into that trap.

13             MR. GOLD:  Any witnesses to that?

14             THE WITNESS:  No, he kicked the

15             witnesses out.

16             MR. GOLD:  Okay.  Did you file a

17             grievance about it?

18             THE WITNESS:  No.  I didn't know about

19             filing grievances.  I never knew about

20             grievances.

21             MR. GOLD:  Have you ever filed any

22             grievances against Dr. Smith?

23             THE WITNESS:  Yeah.

24             MR. GOLD:  And in those grievances did

1              you ask for monetary damages?

2                    THE WITNESS:  Man, listen --

3                    MR. GOLD:  I need answers to these

4        questions.

5                    THE WITNESS:  I can't recall, man.

6                    MR. GOLD:  Okay.  Did you appeal the

7        grievances, all the way through the three

8        tier stage, as to Dr. Smith?

9                    THE WITNESS:  Listen --

10                   MR. GOLD:  If you know.

11                   THE WITNESS:  Listen, I appealed all the

12       grievances.  I appealed all of the

13       grievances, based on my medical condition, to

14       the highest level, yeah.

15                   MR. GOLD:  Well, do you have an

16       explanation for the fact that the records of

17       the prison don't show any grievances

18       concerning your medical condition as to Dr.

19       Smith?

20                   THE WITNESS:  The reason why they don't

21       show that you -- what did you say?

22   BY MR. WRIGHT:

23   Q        There are no grievances against Dr. Smith --

24                   MR. GOLD:  Am I right about that, they

1              don't show any grievances against Dr. Smith?

2    BY MR. WRIGHT:

3    Q         -- about your medical condition.  There are

4    no grievances in your record.

5              MR. GOLD:  Against Dr. Smith.

6              THE WITNESS:  Listen, every grievance I

7         filed is against Dr. Smith, the warden, the

8         C.H.C.A., all the doctors, you know what I'm

9         saying.  Because I told all of them I need

10        surgery and they all denying me surgery.  So

11        every grievance I filed is against all of

12        them.  There ain't no specific person.

13             MR. GOLD:  Other than denying you

14        surgery, what complaint do you have against

15        Dr. Smith?

16             THE WITNESS:  Because he had something

17        to do with that situation.

18             MR. GOLD:  What situation?

19             THE WITNESS:  That rape situation, man.

20             MR. GOLD:  Other than that, what is your

21        complaint against Dr. Smith?

22             THE WITNESS:  What you mean?  I want to

23        be compensated for what I went through.

24             MR. GOLD:  Okay.  So you want

1    compensation from Dr. Smith for the rape,

2    because he helped organize the rape.

3         THE WITNESS:  I ain't -- listen, man --

4         MR. GOLD:  Is that what you are saying?

5         THE WITNESS:  I can't say for a fact,

6    you know what I'm saying, that that was done.

7    I'm just saying I believe he had something to

8    do with it.

9         MR. GOLD:  Do you have any witnesses who

10   will testify that he helped organize the

11   rape?

12        THE WITNESS:  No.

13        MR. GOLD:  Okay.  Do you have any

14   documents that support that?

15        THE WITNESS:  No.

16        MR. GOLD:  And your only other complaint

17   against Dr. Smith is that he won't authorize

18   surgery?

19        THE WITNESS:  I got a whole lot of

20   complaints against Dr. Smith.

21        MR. GOLD:  Well, we need to go through

22   all of them.

23        THE WITNESS:  I mean, ask me some

24   questions.

1                    MR. GOLD:  I've had it.  Go ahead.

2    BY MR. WRIGHT:

3    Q           Mr. Peay, I want to bring your attention --

4    you have a grievance from August of '01, the time when

5    you are saying the assault occurred.  And there is no

6    mention in that grievance about an assault.  How would

7    you explain that?

8    A              I mean, listen, who was it to?  You said you

9    have a grievance?

10   Q           You have a grievance that you addressed to

11   Leslie Hatchet and it eventually went to Julie Knauer.

12                    MR. WRIGHT:  And for the record, it's

13                    Grievance number 2350, dated 8/23/01.

14                    THE WITNESS:  Listen, you know what I'm

15                    saying, when a situation like that happened,

16                    right, and based upon me already knowing that

17                    they was against me and that they had, you

18                    know what I'm mean, I was mentally -- I was

19                    in shock.

20   BY MR. WRIGHT:

21   Q           But you're filing grievances during this

22   time, but you're not filing --

23   A              There ain't nothing I can talk to people

24   about.  That's not something I feel comfortable telling

1    somebody.  I was in shock, man.

2    Q           I understand.  I don't --

3    A           I got raped, you know what I'm saying.

4    Q           I can't put myself in your situation, but I

5    understand what you are saying.  However, you do

6    understand that you must exhaust a claim before you

7    bring it to court.  And you never grieved the rape that

8    you are talking about.  You filed a complaint in

9    November of '01.  You filed two grievances in November

10   of '01.  You filed a grievance in August of '01.  There

11   is no mention of a rape.

12   A           Listen, I told them on the paperwork when I

13   requested it.

14   Q           I asked you earlier if you had sent an inmate

15   request to staff about this.

16   A           Yes, I did.  Yes, I did.  I said yeah.

17   Q           Now, in August of '01, you filed a grievance

18   about the care you're receiving for your abdomen.  And

19   you indicated that you had been shot previously in your

20   abdomen.

21   A           Right.

22   Q           Now, I have a response from Ms. Knauer which

23   says she reviewed this with you.  Do you recall her

24   coming in and --

1    A          Talking to me in person?

2    Q          Well, evidently she either spoke to you or

3    she sent you a copy of this back saying that she went

4    over your grievance, she reviewed your medical records,

5    and that you are receiving adequate medical treatment.

6    A          I'm saying, listen, if you got a bunch of --

7    listen, if you got some inadequate doctors, right, and,

8    you know -- say guards don't like me, like -- the

9    guards don't like me, man, you know what I'm saying.

10   They in conspiracy with the doctors.  Now, the doctors

11   might want to do something for me, but the guards go to

12   them and tell them, no.  So now the doctor is going to

13   fabricate the paperwork and make it look like I ain't

14   got a medical condition.

15   Q          Do you have any proof of this, other than

16   what you believe?

17   A          Everything that happened is proof, man.  Look

18   at my teeth, man, you know what I'm saying.

19   Q          My point is --

20   A          What do I got to be fabricating a story

21   against them for?  They started all of this situation.

22   Q          Ms. Knauer did respond to your complaint.

23   She is not a doctor, but she did respond to your

24   complaint.

1   A         But she ain't boss, man.  She doesn't

2   probably order them to do something, man.

3   Q         **So you would have her tell the doctors --**

4   A         She could make sure I'm sent to a hospital

5   and all of that, man, you know what I'm saying.  When I

6   filed the complaint I was asking them to send me to a

7   hospital and they didn't do -- they didn't send me to a

8   hospital, you know what I'm saying.  I had to file a

9   complaint to go to a hospital.

10          And then when I went to the hospital they

11  rushed me right back without even letting the doctor

12  talk to me about what medical conditions they found,

13  you know what I'm saying.  And all of that -- this is

14  just a -- what do you call that situation, this is

15  shopping around for an opinion, man.  That's all it is.

16  You know, nonmedical -- you know.

17  Q         **Do you recall being sent to an outside**

18  **hospital for your abdomen problems?**

19  A         From here, right?  That's what I'm talking

20  about.  The opinion that they got from the doctor out

21  there, they shopping around for an opinion, man.

22  Q         **So you do admit that you were seen by an**

23  **outside facility?**

24  A         Yeah, after I filed a complaint.

1    Q        And you do admit you were seen for your

2    stomach and abdomen problems, that is what you went

3    there for, is that correct?

4    A        After I filed the complaint, yeah.

5    Q        You are just in disagreement with the

6    doctor's conclusion?

7    A        I'm hurt, man.  What part don't you

8    understand?  Listen, man, I can't even go outside.  I

9    can't do nothing, man.  It ain't no -- it ain't about

10   me being in disagreement with them.  I'm telling you

11   something that is fact.  I'm hurt, man.  I need

12   surgery.  My chest is messed up.  I can't go to the

13   bathroom.  I can't live life right, you know what I'm

14   saying.  I'm hurt, you know what I'm saying.  You know,

15   something ain't right with me.  The opinion they

16   shopped around for is a conspiracy, you know what I'm

17   saying.

18   Q        But for the record --

19   A        They intentionally, maliciously and

20   significantly denying me surgery, man.  I need surgery.

21            MR. WRIGHT:  For the record, the MH

22            referring is to Mercy Suburban General

23            Hospital, a Dr. Zappitelli, who saw the

24            inmate on 10/9/02, and his conclusion was

1                 that there was no definitive obstruction of

2                 his colon.

3     BY MR. WRIGHT:

4     Q        And you are in disagreement.  You believe

5     that is a shopped around opinion?

6                 MR. GOLD:  And that was based on a film

7            that was taken of the abdomen.

8                 THE WITNESS:  I know that was --

9                 MR. GOLD:  Hold on.  I want to just get

10           this on the record.  That was based on a film

11           that was taken of the abdomen.

12                 MR. WRIGHT:  Thank you.

13                 MR. GOLD:  A double air contrast study

14           as well.  It was a radiology consultation.

15                 MR. WRIGHT:  A barium enema.

16                 MR. GOLD:  Right.

17    BY MR. WRIGHT:

18    Q        Mr. Peay, I want to also bring your attention

19    to, you filed a grievance in November of '01.  November

20    24th of '01.  Grievance number 8450.  And in that

21    grievance you were grieving medical treatment for your

22    abdomen.  That you wanted to go to an outside hospital.

23    The Correctional Health Care Administrator, Knauer,

24    wrote you back indicating that she had reviewed your

1    record and your chart, and that there was appropriate

2    treatment that was being followed.  And again --

3    A          All right, look, stop right there.  When do

4    you say that was, 2001, right?

5    Q          Yes.  November of 2001.

6    A          So now, listen, this is 2003.  Why is your

7    client still giving the same exact answer to my

8    grievance?

9    Q          I'm not aware of what you are talking about.

10    A          I'm telling you, you know what I'm saying,

11    what is going on.

12    Q          I'm trying to focus on --

13    A          I'm telling you I need surgery.  I told your

14    client back then, a long time ago, that I needed

15    surgery.  And she said I had nothing.  My problem was

16    nothing.  Now she's still telling me the same thing.

17    I'm still -- my condition got worse.  Something loose

18    inside my stomach on both sides, you know what I'm

19    saying.  I'm hurt, man.  You can look at my abdomen and

20    tell something is wrong.  Would you like to see it?

21              MR. GOLD:  Yeah, I would like to.

22              THE WITNESS:  (Witness complies.)

23              MR. GOLD:  If he's allowed to show it to

24         me.

1          THE WITNESS:  There.  (Indicating.)

2          MR. GOLD:  What do you think is wrong

3     with your abdomen?

4          THE WITNESS:  Like right here, at the

5     bottom of my abdomen right here, it's not

6     supposed to be sticking out like that, man.

7     It's supposed to be like this.  There is

8     something wrong with the inside, you know

9     what I'm saying.  It's making me unable to go

10    to the bathroom.

11         MR. GOLD:  Have you gained any weight in

12    the last two years?

13         THE WITNESS:  No, I've lost weight.

14         MR. GOLD:  But you have been constipated

15    consistently?

16         THE WITNESS:  Exactly, being as though

17    something is wrong.

18         MR. GOLD:  Well, tell me, how do you be

19    constipated for two years and lose weight?

20    If you are constipated you usually gain

21    weight.

22         THE WITNESS:  Because they put something

23    in the coffee to make me go the bathroom.

24         MR. GOLD:  So you are going to the

1              bathroom.

2                    THE WITNESS:  Not on my own, that's what

3              I'm trying to tell you, man.

4                    MR. GOLD:  Okay.

5    BY MR. WRIGHT:

6    Q         The scar that we saw, that went from your

7    sternum down past your belly button, what would that

8    scar be from, if you recall?

9    A         What you were talking about before, man.

10   Q         From the gunshot wound?

11   A         Yeah.

12   Q         That is not from anything that's happened --

13   A         Here, no.

14   Q         Mr. Peay, I want to also bring your

15   attention, you filed a grievance on January 15 of this

16   year, number 12161, again you're grieving the lack of

17   medical treatment for your abdomen and intestinal

18   problems.  And, again, do you recall that Ms. Knauer

19   responded to that grievance in accordance to her duties,

20   do you recall that?

21   A         I mean --

22   Q         Indicating that she had reviewed your --

23   A         Her response was inadequate, man.

24   Q         But you do admit she responded?

1    A         Yeah, she had to respond.  That's her duty,

2    you know what I mean.  If there was supposed to be a

3    response to my grievance she responded.  They didn't

4    respond to the last one, though, about the assault.

5    Q         **Have you ever refused medical treatment at**

6    **this institution?**

7    A         No.

8    Q         **Have you ever missed medical appointments?**

9    A         No.  Not intentionally, no.

10   Q         **So you have missed --**

11   A         The guards, they wasn't telling me when I was

12   supposed to go to the appointments and stuff.

13   Q         **So you have missed some medical**

14   **appointments?**

15   A         Yeah, they made me miss appointments.  Trying

16   to make it look like it was me.

17   Q         **Mr. Peay, you also have a grievance dated**

18   **2/17/02 of this year, February of this year, number**

19   **14579, that again talks about you being drugged and**

20   **raped.  And, again, do you recall Correctional Health**

21   **Care Administrator Knauer responding to you indicating**

22   **that she reviewed your records, reviewed your chart,**

23   **and believed that you were receiving adequate**

24   **treatment?  Do you recall her responding?**

1    A         Yeah, but look, it's like -- they

2    intentionally, like I said, they interfering with my

3    court matters, you know what I'm saying.  That's why

4    they denying me surgery.  And that's why, you know what

5    I'm saying, they lying about what is really wrong, you

6    know what I'm saying.

7    Q         Now --

8    A         I'm innocent and they conspiring with corrupt

9    cops trying to frame me, you know what I'm saying.

10   They thinking just because -- they thinking just

11   because they denying me -- they intentionally and

12   maliciously denying me surgery that I'm going to say --

13   that I'm going to go along with them, you know what I'm

14   saying.

15   Q         If you could explain something for me, Mr.

16   Peay, in this grievance, that you -- 14579, that you

17   rewrote on April 13th of '02, this is the first mention

18   of you being raped in August of '01, in any grievance

19   that I have been able to find.  Could you explain to me

20   why it shows up, for the first time, eight months after

21   -- you allege the rape took place in August of '01.

22   The first time this shows up in a grievance was in

23   April of '02.  Could you explain that to me?

24   A         I ain't going to say that was the first time.

1  I don't know when the first time was, you know what I'm

2  saying.  I reported the rape to your client, you know

3  what I mean, and they didn't do nothing about it, you

4  know what I mean.

5           I shouldn't have to file a grievance about

6  being raped.  Once I tell the warden I was raped they

7  supposed to do everything they supposed to do, medical

8  wise, and that's that.  I don't have to file

9  a grievance about being raped.  That's against the law,

10  man.  What is wrong with your clients not doing their

11  job when I tell them that I was raped, you know what

12  I'm saying.

13           If I'm raped, I'm raped.  You know what I'm

14  saying, they supposed to do something about it, you

15  know what I'm saying, as soon as I tell them.  You

16  know, I'm supposed to get immediate relief.  It don't

17  take me to have to file a grievance to get relief,

18  based upon that situation happening, man.  They ain't

19  here just to be harassing me and all of that.  They

20  here to do a job.  I don't have to file a grievance.

21  This is a serious situation, man.

22  Q         And finally, Mr. Peay, on August 14th of '02,

23  you filed grievance 28134, again, alleging denial of

24  medical treatment and complaining about your abdomen

1    and stomach problems.  And, again, Correctional Health

2    Care Administrator Knauer responded to that grievance.

3    You just don't like the response that she gave, is that

4    correct?

5    A        It ain't just that.

6    Q        She indicated that she has reviewed your

7    concerns, reviewed the chart.

8    A        Listen, she know I got a problem but she

9    acting like she don't know, you know what I'm saying.

10   It's point blank.  Like I said, it's conspiracy, man.

11   Q        So she was responding but you just didn't

12   like the way she was responding?

13   A        No.  She's obstructing justice and that's

14   against the law.  421985, conspiracy to interfere with

15   civil rights one, two and three and trying to

16   intimidate me, man, by denying me surgery.

17   Q        So you don't deny that she was responding to

18   your complaints?

19   A        I'm not -- man.

20   Q        You just didn't like the way she was

21   responding, is that the problem here?

22   A        No.  The problem, she ain't doing her job,

23   that's the problem.

24   Q        Did she respond in any way to your

1    complaints?

2    A        Yeah, she responded, you know what I mean.  I

3    ain't going to say --

4    Q        Was there ever a time, that you recall, when

5    she did not respond to any of your complaints about the

6    problems that we're here for today, your constipation?

7    A        Yes.

8    Q        Do you recall what that would have been and

9    when?

10   A        It was a whole lot of times, man, about my

11   medical situation.

12   Q        Any grievances that you recall she didn't

13   respond to?

14   A        No, I can't recall.

15   Q        What are you referring to when you say she

16   didn't respond?

17   A        When I was writing the request slips and

18   stuff, saying this and that.  Explaining to her my

19   medical situation, she didn't respond.

20   Q        So she responded to your grievances, but not

21   to your request to staff, is that it?

22   A        I mean, you know, if I sent a request to

23   staff, that's like a personal -- that's like between me

24   and her.  Now, if I write a grievance, there's other

1    people that know about it, you know what I'm saying.

2    Q        **What do you believe Sergeant Thomas should**

3    **have done with the situation we're here for today?**

4    A        He should have moved the person to a

5    different cell, you know what I'm saying.  They putting

6    people in my cell, you know what I'm saying, to harass

7    me, man.

8    Q        **Did they put more than one person in your**

9    **cell?**

10   A        Yeah.  There has been people in my cell that

11   smoke.  I don't smoke.  They was intentionally doing

12   stuff, man.  Just like they put me in a cell with

13   somebody that had hepatitis.  I could have caught

14   hepatitis, man, you know what I'm saying.  You know,

15   they be doing all types of crazy stuff, man.

16   Q        **Now, if you could explain to me, you've had**

17   **some mental problems as a result of this incident.**

18   **Could you explain to me how that came about or what**

19   **happened with that?**

20   A        What I'm saying, based upon, you know what

21   I'm saying, all of this stuff that's been happening.

22            MR. GOLD:  Based upon the incident,

23            what's the incident?  The rape or the failure

24            to provide care?

```
 1                THE WITNESS:  Rape, failure to provide

 2           care, pumping harmful gas in my cell,

 3           assaulting me, you know what I'm saying.

 4           Everything has affected me mentally.  Me

 5           being in jail, you know what I'm saying.  An

 6           innocent man, you know what I'm saying.  That

 7           has affected me too.

 8   BY MR. WRIGHT:

 9   Q        What are you in jail for currently?

10   A        I can't, you know what I'm saying, talk about

11   it, man.

12   Q        Okay.  This has just taken a mental toll on

13   you?

14   A        Yeah.

15   Q        How has that changed you?  How would you

16   describe what that has done to you?

17   A        I'm extremely emotionally stressed.  I'm

18   depressed, you know what I'm saying.

19   Q        Are you being seen by medical staff for that?

20   A        Mentally?

21   Q        Yes.

22   A        They in conspiracy too.  They denying me

23   treatment too.

24   Q        In the same way that you've described the
```

1  other things?

2  A          Yeah.   There are some corrupt officials

3  involved, you know what I'm saying.

4  Q          Do you recall -- I can't remember your answer

5  previously, do you recall denying medical treatment on

6  occasion?

7  A          No.   You see, they be fabricating my

8  paperwork, man.   That's like they put me in a cell

9  saying I'm -- how can you put me in a cell, right, a Z

10  code, I ain't never had no assaults.   They labeled me a

11  Z.A.B.   That's aggressive behavior.   I never had

12  assaults, man.   They put me on that status.   But that's

13  a coverup based on that assault.   So that's why I'm

14  telling you, they fabricated the paperwork, you know

15  what I'm saying.   I notice that too, they try to act

16  like I'm aggressive or that I've been assaulting

17  people, just to not send me to a hospital.

18  Q          When were you Z coded, if you recall?

19  A          Right after that situation.   Right after the

20  rape, you know what I'm saying.   They didn't even --

21  they supposed to staff me, they didn't even staff me,

22  you know what I'm saying.

23  Q          Did you ever grieve that incident?

24  A          You see, I never knew nothing about the

1   grievances, you know what I'm saying.

2   Q        But you did file a grievance on August 23rd

3   of '01?

4   A           Yeah, because somebody explained it to me,

5   you know what I'm saying.

6   Q        So you could have, during August of '01,

7   filed a grievance within 30 days?

8   A           No, they didn't say that.

9   Q        That scar that we saw, that was just the scar

10  from the gunshot, that is on your abdomen?

11  A           Yeah.

12  Q        Do you recall ever attacking medical staff

13  when you went for medical treatment?

14  A           No.  Why would I attack medical staff?

15  Q        Did you have prior surgery on your abdomen as

16  a result of the gunshot wound?

17  A           No, just that one surgery, that's it.

18  Q        You had surgery.  That scar represents

19  surgery?

20  A           Yeah.

21  Q        So there has been surgery in your abdomen

22  area previously?

23  A           Correct.  Like something wrong with my colon,

24  man, you know what I'm saying.

1    Q        Do you recall admitting to medical staff that

2    you had abdominal pain for some time, a long time

3    before the assault in August of '01, as a result of the

4    gunshot wound?

5    A        Do I recall admitting?

6    Q        Stating -- telling medical staff that because

7    of your gunshot wound, we saw the scar, that you had

8    prior stomach problems?

9    A        No.  See, the surgery from the gunshot wound,

10   right, it has nothing to do with my current medical

11   condition, you know what I'm saying.

12   Q        How would you know that?

13   A        Because I know, you know what I'm saying.

14   Q        Are you medically trained?

15   A        Listen, years, you know what I'm saying,

16   after I had surgery, you know what I'm saying, I was --

17   I didn't have a problem.  I didn't start having a

18   problem until I got framed for murder, and that's when

19   I started having problems, you know what I'm saying.

20   And it's a conspiracy and these cops here, these

21   officials here are involved.

22   Q        Did you have stomach problems after the

23   gunshot wound and the surgery for the gunshot wound,

24   you didn't have any stomach problems at all?

1    A          Excuse me?

2    Q          In '96 you had a gunshot wound and you had

3    surgery on your abdomen.  At that time, in '96, did you

4    have any stomach problems?

5    A          What you mean, like you know, the problems I

6    supposed to have?

7    Q          Any type of problems?

8    A          Anything irregular?

9    Q          Anything irregular with your stomach as

10   a result of that surgery?

11   A          No.

12   Q          Do you recall, in August of '01, telling

13   medical staff that you had chronic abdomen problems?

14   A          Excuse me, say that again.

15   Q          Around the time of the assault, do you recall

16   telling medical staff that you had chronic abdominal

17   problems?

18   A          No.  That's -- they labeled that.

19   Q          Now, when you went to see medical staff in

20   August of '01, your medical records do not say anything

21   about a problem with your rectum.  Could you explain

22   that?  Or September of '01, November of '01, there is

23   no complaint to medical staff about a rectum problem.

24   Can you explain that?

1    A          No, I can't explain that, no.

2    Q          Could you explain, your medical records

3    reveal that in June of '01, two months before August of

4    '01, the medical records show that you had ongoing

5    stomach problems?

6    A          Excuse me.

7    Q          Would you agree with that?  Two months before

8    the assault you had stomach problems?

9    A          Yeah.

10   Q          And you are claiming stomach problems as a

11   result of this assault?

12   A          I didn't say that.  You didn't ever hear me

13   say that.

14   Q          So do you have stomach problems as a result,

15   nausea, stomach problems as a result of the assault in

16   August of '01?

17   A          I said I wasn't going to say that, no.

18   Q          Do you recall having pain in your stomach in

19   December of '98?

20   A          '98, no.  You got me down there for something

21   like that?

22   Q          That's what your records reveal.

23   A          I don't remember.

24   Q          Do you recall not showing up for medical

1  appointments during May and June of '98, just not

2  showing up, could you explain that?

3  A        I wasn't even here in May and June of '98.

4  Q        Now, you previously said that you were on a

5  lot of different laxatives, I believe, after the August

6  of '01 incident, is that correct?

7  A        You are talking about not having nothing to

8  do with that situation?

9  Q        Right.

10 A        You're just saying abdomen.

11 Q        Yes.  You are on a lot of different

12 laxatives?

13 A        Yeah.

14 Q        Kaopectate?

15 A        I don't know.

16 Q        Okay.  Milk of Magnesia?

17 A        Yeah.

18 Q        You said that you are on Colace, that's a

19 stool softener, is that correct?

20 A        Yes.

21 Q        And you are presently still on that?

22 A        Yeah.

23 Q        Metamucil?

24 A        Yeah.

1    Q              Taking Metamucil?

2    A              Yeah.

3    Q              And, again, how would you explain the

4    doctors' orders, during August and September '01, not

5    making any mention of a problem with your rectum, how

6    would you explain that?

7    A              Excuse me.

8    Q              The doctors' notes from August and September

9    of '01, the time that the assault took place, there is

10   no mention of a problem with your rectum, could you

11   explain that?

12   A              No.  Because, listen, they knew it happened,

13   right.  And when I went to the dispense unit, you know

14   what I'm saying, they checked my records, right, and

15   they was playing around, you know what I'm saying, they

16   thought it was funny, you know what I'm saying.  You

17   know, they knew what happened, you know what I'm

18   saying, and they didn't do nothing about it, you know

19   what I mean.

20   Q              So you've obviously been getting medical

21   treatment.  I mean, they have changed up your -- you

22   are on a lot of different laxatives.

23   A              I've been on the same laxatives.

24   Q              But, I mean, they're changing them.  You've

1    been on Metamucil, you've been on --

2    A        But I've been on them more than one time,

3    more than two times.

4    Q        But my point being, you can't get that

5    without going to get medical treatment.  You can't

6    change up your laxatives.

7    A        That's easy.

8    Q        My point being, you've had some contact with

9    medical staff?

10   A        No, not really.

11   Q        I mean, you either have or you haven't.  I

12   mean --

13   A        You know --

14   Q        Maybe you don't like the contact, but you've

15   had contact.

16   A        It ain't that.  They just ain't doing their

17   job, man.  I need surgery.  What do I look like telling

18   somebody I need surgery and I don't need surgery?  You

19   think I want -- I know how I feel to have surgery, you

20   know.  I'm saying I need surgery.  I ain't going to

21   tell them I need surgery and I ain't need it.  I can't

22   even leave, you know what I'm saying, the cell and all

23   of that.

24   Q        I know that you've had some constipation

1    **problems.**

2    A        It ain't constipation, I've got a serious

3    problem, man.

4    **Q        But you have a problem moving your bowels?**

5    A        Something tore inside my abdomen and I can't

6    use the bathroom.

7    **Q        You can't go to the bathroom.**

8    A        Yeah.

9    **Q        And this is a result of the August assault?**

10    A        No, I ain't say that.

11    **Q        Okay.**

12    A        I had problems before that.

13    **Q        You had constipation problems?**

14    A        Yeah.

15    **Q        So if I told you that your medical records**

16    **show that in 12/98 you were on a laxative --**

17    A        I would say you was lying.

18    **Q        Okay.**

19    A        I mean not you, but --

20    **Q        The records aren't correct.**

21    A        Yeah.

22    **Q        But you have had constipation problems prior**

23    **to the August assault?**

24    A        Yeah.

1    Q          Okay.  Do you recall where you went -- in

2    '96, when you received your gunshot wound, do you

3    recall what hospital you went to?

4    A          Yeah.

5    Q          What hospital would that be?

6    A          What do you mean, that operated on me?

7    Q          Wherever you received medical treatment.

8    A          Where I had surgery, right?

9    Q          Right.

10    A          University.

11    Q          University of Pennsylvania?

12    A          Yeah.  Staff probably has something to do

13    with that.

14                    MR. GOLD:  Pardon me, what did you say?

15                    THE WITNESS:  I said staff probably had

16              something to do with that.

17                    MR. GOLD:  With your gunshot wound?

18                    THE WITNESS:  Yeah.

19                    MR. GOLD:  You're kidding, right?

20                    THE WITNESS:  No, I'm serious, man.

21                    MR. GOLD:  You're serious, okay.  How

22              about Dr. Smith, did he have something to do

23              with your 1996 gunshot wound?

24                    THE WITNESS:  Is you playing around or

1          is you asking me a serious question?

2               MR. GOLD:  I'm asking.

3  BY MR. WRIGHT:

4  Q         Mr. Peay, we are all here very serious.  And

5  I've worked with Mr. Gold and we are very serious.

6  Please don't take his questions to be something that

7  you think he's playing around with, please.

8               MR. WRIGHT:  Could you read the question

9          back?

10              THE WITNESS:  Can I use the bathroom?

11              MR. WRIGHT:  Could you answer this last

12         question?

13              THE WITNESS:  I gotta use the bathroom

14         first.

15              MR. WRIGHT:  Could you read Mr. Gold's

16         question back, please.

17              THE WITNESS:  I ain't going to be able

18         to answer it without going to the bathroom

19         first.

20                    *    *    *

21              (Whereupon, a short break was taken.)

22                    *    *    *

23              (Whereupon, the court reporter read from

24         the record.)

```
1                          *    *    *

2                    THE WITNESS:  I don't know.

3                    MR. GOLD:  Okay.

4    BY MR. WRIGHT:

5    Q          Mr. Peay, I want to ask you, and I know it's

6    somewhat difficult and sensitive, but it's in your

7    lawsuit.  I want to ask you about the assault.  How did

8    you first find out or come to an understanding that you

9    had been assaulted?  If you can take me back in time,

10   how did you first figure this out?

11   A          When I woke up, you know what I'm saying, I

12   felt like something was wrong, you know what I'm

13   saying.

14   Q          With the back end?

15   A          Yeah.

16   Q          Okay.  And from there you -- what was your

17   next thought, if you recall?

18   A          You know what I'm saying, you know, he did

19   something to me, you know.

20   Q          That was the only way that you could explain

21   it to yourself?

22   A          Yeah.

23   Q          Did you say anything to your cell mate, if

24   you recall?  Did you ask him?  Did you have a
```

1    discussion?  Did you confront him?

2    A           Yeah, I said something to him.

3    Q           What was his response, if anything?

4    A           He was acting weird, you know what I'm

5    saying, like he -- you know what I mean.

6    Q           Did he admit it?

7    A           No, he didn't admit it.

8    Q           And what -- what was the next thing that you

9    did?

10   A           Man, wasn't really nothing -- I mean, you

11   know, you know -- what do you mean?

12   Q           I just want to know what happened next.  I

13   mean, did you talk to somebody?  Did you try to talk to

14   the sergeant on the block?  Did you try to do something

15   to your cell mate?

16   A           No, I was in shock, you know what I'm saying.

17   I was mentally, you know what I'm saying, messed up.

18   Q           Now, I want to ask you, to the best of your

19   memory, when did your rectum problems first occur?

20   After the assault?

21   A           No.

22   Q           When did your rectum problems first occur?

23   A           Some of these problems I got now?

24   Q           Yes.  The problems that you refer to in your

1    lawsuit, that you have rectum related problems.

2    A          Those problems in the lawsuit, you know what

3    I'm saying, like 2001, problems.

4    Q          As a result of the assault?

5    A          No.

6    Q          Before the assault or after the assault?

7    A.          Both.

8    Q          Okay.  So you had rectum problems --

9    A          I was having problems before the assault.

10   Q          With your rectum?

11   A          I'm having different problems after the

12   assault, you know what I'm saying.  But I ain't going

13   to say due to the assault, though, you know what I'm

14   saying.

15   Q          Okay.  How about your constipation, you had

16   constipation before the assault?

17   A          Yeah.

18   Q          How about your abdomen pain, did you have

19   your abdomen pain --

20   A          That's what I'm talking about.

21   Q          Before the assault?

22   A          Yeah.  Before the assault.  Abdomen pain,

23   constipation, all of that.  When I say abdomen, when I

24   -- I'm talking about the whole situation, you know what

1    I'm saying.

2    **Q**          **Okay.**

3    A          Like, I was raped, man, you know what I'm

4    saying.  I started having medical problems, you know

5    what I'm saying.

6    **Q**          **Had you been treated, before the assault,**

7    **for these problems, for your rectum problems?  Had you**

8    **received treatment before?**

9    A          They was denying me treatment, you know what

10    I'm saying.

11    **Q**          **They were denying you treatment before the**

12    **assault as well?**

13    A          Listen, I know what is going on here, you

14    know what I'm saying.  They was denying me care, dude.

15    **Q**          **So you have received some medical treatment.**

16    **We just went over some of the grievances, we went over**

17    **some of your medical records.  You have received**

18    **medical treatment at Graterford?**

19    A          No.

20    **Q**          **You haven't received medical treatment?**

21    A          No, not the treatment I'm supposed to

22    receive.

23    **Q**          **You have received treatment, you just don't**

24    **like the treatment you have received?**

1   A        No, I ain't going to say that.  They ain't

2   treating me, man.  It's against the law to be on

3   laxatives this long.  They trying to kill me, man.

4                    MR. WRIGHT:  Do you have any questions?

5                    MR. GOLD:  Yeah, I have some questions.

6                         *    *    *

7                         EXAMINATION

8                         *    *    *

9   BY MR. GOLD:

10  Q        Now, my name is Alan Gold.  I'm an attorney

11  and I represent Dr. Smith.  If you don't understand the

12  questions I ask you, let me know and if I ask it

13  inappropriately I'll rephrase it.  If you answer the

14  question I'm going to assume you understand the

15  instructions, do you understand that instruction?

16  A        Hold on, say that again.

17  Q        I'm going to ask you some questions.  If you

18  don't understand the question, let me know.  I'll

19  rephrase the question, if you don't understand it.  If

20  you answer the question, I'm going to assume that you

21  understood the question, okay?

22  A        All right.

23  Q        Do you understand that?

24  A        I heard you.

1    Q         Okay.  Now, you said previously that Dr. --

2    the complaint against Dr. Smith was his involvement in

3    the sexual assault and that he wouldn't authorize

4    surgery for your abdomen.  What other complaints do you

5    have about Dr. Smith, if any?

6    A         A whole lot, man.

7    Q         I need to hear them all.

8    A         I mean, listen --

9    Q         If you are going to get on the stand at trial

10   in front of a jury and say that Dr. Smith did A, B, and

11   C, I have to hear it here.

12   A         Yeah.  You know what I'm saying, I brought my

13   complaints to his attention, you know what I'm saying,

14   he didn't do nothing about it.

15   Q         What complaints did you bring to his

16   attention?

17   A         The sexual assault, the medical situation, my

18   abdomen problems.

19   Q         Okay.  Is the abdomen problem what you refer

20   to as the medical situation?

21   A         Excuse me?

22   Q         You said medical situation and then you said

23   abdomen problem.  Is that two different things?

24   A         No.

1    Q          It's the same thing?

2    A          Yeah.

3    Q          Okay.  So you brought the sexual assault to

4    his attention and the abdomen problem.  What else?

5    A          You know what I'm saying, what else could I

6    bring to his attention?

7    Q          Okay.  What do you mean you brought the

8    sexual assault to his attention?  What did you want

9    him to do about the sexual assault?

10    A          I wanted to be examined.

11    Q          And he didn't examine your rectum?

12    A          I told him, you know what I'm saying, my

13    colon might be ruptured.  He said he was going to do a

14    test.

15    Q          Didn't they test your colon with a barium

16    enema?

17    A          When did they say they was going to test it,

18    though?  When did the test actually happen?

19    Q          But it did happen, correct?

20    A          He told me it was going to happen in January

21    and it don't happen until the next year, that's a

22    problem.

23    Q          It happened October 20, '02 and it showed

24    nothing.  Have you ever seen the test results?

1    A          No.

2    Q          **Do you want to see it right now?**

3               MR. GOLD:  I'm going to have it marked

4          as P-1.

5               THE WITNESS:  How did it show nothing?

6               MR. GOLD:  Huh?

7               THE WITNESS:  You said it showed

8          nothing.

9               MR. GOLD:  Here, I'm going to show you

10         the test result.  I'm going to mark this as

11         P-1, okay.  That is your test results,

12         October 9th.

13                         *    *    *

14              (Whereupon, the above-mentioned document

15         was marked for identification as P-1.)

16                         *    *    *

17              MR. WRIGHT:  That is the document I was

18         referring to earlier from Mercy Suburban

19         General Hospital.

20              THE WITNESS:  This say right here,

21         extremely redundant and tortuous colon.

22    BY MR. GOLD:

23    Q          **It says it's normal, though?**

24    A          What do you mean, there is no problem?

1    Q       **Pardon?**

2    A       What do you mean it ain't no problem.  It

3  says, extremely redundant and torturous colon.

4    Q       **It shows you are constipated?**

5    A       No, listen, and I got paperwork in my cell,

6  in the cell, from somebody out in the street saying

7  that my condition warrants surgery.

8    Q       **Who said that?**

9    A       You know, what I'm saying, some girl on the

10  internet that got it from the doctor.

11    Q       **Pardon?**

12    A       From some girl on the internet that got it

13  from a doctor.

14              MR. WRIGHT:  Would you be able to

15             produce that document to your lawyer?

16              THE WITNESS:  Yeah, no doubt.

17              MR. WRIGHT:  If we could make a request

18             on the record to --

19              MR. GOLD:  And I reserve the right to

20             redepose him on that.

21  BY MR. GOLD:

22    Q       **What did you say, some girl did what?**

23    A       Some girl went on the internet and got --

24    Q       **I didn't hear it, some girl what?**

1   A           Some girl went on the internet and got it

2   from the doctor or whatever, you know what I'm saying.

3   Q           **What is the name of the doctor?**

4   A           I don't even know.

5   Q           **Did he ever examine you?**

6   A           No.  But I'm saying it's like the same

7   condition I got.  It's the same condition that they

8   explained.

9   Q           **Okay.  Your abdomen, wasn't it x-rayed three**

10  **times?  Weren't you sent out for x-rays by Dr. Smith?**

11  A           You know why I was x-rayed so many times?

12  Q           **Well, you were, right?**

13  A           No, listen, they was trying to make signals

14  that I would see through, like I was lying about

15  something that I wasn't lying about.  That is why they

16  was doing x-rays, trying to assassinate my character

17  and, you know, play with my intelligence.  That's what

18  it was about, harassment.

19  Q           **So you believe that Dr. Smith did not examine**

20  **you sufficiently for your sexual assault, he should**

21  **have done more about your colon?**

22  A           Yeah.

23  Q           **Okay.**

24  A           I'm hurt.  I got a serious medical problem

```
 1   and they blew it off.

 2   Q          Do you have a medical expert who's going

 3   to --

 4   A          They sent me to Mercy Hospital.  You know

 5   that game called Mercy where somebody put pain on you

 6   until you say mercy, that is what they was trying to do

 7   to me.

 8   Q          Okay.  Do you have a medical expert that is

 9   going to say that Dr. Smith's conduct caused you

10   injury?

11   A          My lawyer is going to have to get somebody to

12   petition the courts to get me seen by outside doctors.

13              MR. WRIGHT:  You have been seen by

14              outside doctors.

15   BY MR. GOLD:

16   Q          Let me tell you, that's seldom granted.

17   A          I have been seen by they doctors, you know

18   what I'm saying.  That's what it is.

19   Q          What are you in here for, murder?

20   A          No, man.

21   Q          What?

22   A          No comment.

23              MR. GOLD:  Counsel, I'm entitled to --

24              THE WITNESS:  I have the right to
```

```
 1                remain --
 2                    MR. LOVE:  He mentioned earlier that he
 3           was framed for murder.
 4                    MR. GOLD:   Well, I don't know if that's
 5           why he's here.
 6                    THE WITNESS:  Yeah, that's why.
 7     BY MR. GOLD:
 8     Q          When were you sentenced?  When were you
 9     convicted, I'm sorry?
10     A          No comment, man, because I was framed.
11                    MR. GOLD:  Do you have an objection if I
12           look at his criminal record?
13                    MR. LOVE:  I have no objection.
14                    MR. WRIGHT:  Off the record.
15                         *    *    *
16           (Whereupon, a discussion off the record
17           was held.)
18                         *    *    *
19     BY MR. GOLD:
20     Q          Any other complaints about Dr. Smith, other
21     than what you've mentioned?
22     A          I mean, you know, yeah.  I got to think about
23     it.
24     Q          Well, take five minutes and think about it
```

1    right now.

2    A          I need more time than that.

3    Q          How much time are you going to need?

4    A          I mean, I'm not going to be able to provide

5    you with the information today.

6    Q          Sir, you are here to be deposed.  I'm

7    entitled to know what your complaints are to Dr. Smith.

8    A          I told you what my complaints was.

9    Q          That's it?  Do you have any other?

10   A          Yeah.

11   Q          I need to know them now.

12   A          I can't tell you right now, you know what I'm

13   saying.

14   Q          Why can't you tell me now?

15   A          Because, you know what I'm saying.

16   Q          Pardon?

17   A          Because, you know what I'm saying, it's

18   conspiracy.  It has to do with my civil rights, you

19   know what I'm saying, that I'm being denied surgery,

20   you know what I'm saying.

21               MR. WRIGHT:  Could we take a five

22           minute break?

23   BY MR. GOLD:

24   Q          How is your memory these days, is it good?

1    A        My memory is excellent.

2            MR. WRIGHT:  Off the record for a

3        second.

4                    *    *    *

5            (Whereupon, a short break was taken.)

6                    *    *    *

7    BY MR. GOLD:

8    Q        Are you saying if you had more time you could

9    think of more complaints against Dr. Smith, or you

10   don't know?  Maybe you could, maybe you couldn't?

11   A        No, I ain't saying think of them.  I'm

12   talking about not fabricate some.  I'm talking about

13   facts.

14   Q        Okay.  Do you have documents back in your

15   cell that would help refresh your recollection as to

16   your complaints against Dr. Smith?

17   A        The lawyer got them.

18   Q        Well, can you tell me what those documents

19   are?

20   A        I can't offhand, no.

21   Q        Pardon?

22   A        Not right offhand, no.

23            MR. GOLD:  I would like to make a

24        request for them, to the extent they are not

1                    attorney/client privileged.

2                         MR. LOVE:  We will give you every

3                    document that I have, if I haven't already

4                    done so.  Every document I have I got from

5                    him.

6    BY MR. GOLD:

7    Q          Dr. Smith ever refuse to see you?

8    A          I don't know.  I can't say that.

9    Q          Did you have trouble with other medical staff

10   at Graterford or just Dr. Smith?

11   A          Everybody.

12   Q          How come you just sued Dr. Smith?

13   A          Because that is who was -- that's who the

14   problem was with back then, you know what I'm saying.

15   Q          But, did other doctors you see say, hey,

16   listen, you're right, you should have this, this, and

17   this?

18   A          No.  No.  No other doctor said that.

19   Q          Pardon?

20   A          No.

21   Q          And you saw other doctors here, right?

22   A          Yeah.

23   Q          And they all said they all refused to

24   authorize surgery for you, right?

```
 1    A          I don't know what they said.

 2    Q          Did you ask any other doctors you saw

 3    for surgery?

 4    A          As a matter of fact, when I went to the

 5    hospital, right --

 6    Q          Pardon?

 7    A          When I went to the hospital, right, the C.O.

 8    there told me that they was supposed to -- I was

 9    supposed to be back in the hospital in a couple days

10    due to the seriousness of my problem.  But the doctor

11    ordered for me to have surgery.

12    Q          Who told you that?

13    A          That's what the C.O. said.

14    Q          C.O.?

15    A          Yeah, correctional officer.

16    Q          Okay.  Tell me the name of the correction

17    officer?

18    A          Williams.

19    Q          Williams told you that?

20    A          Yeah.

21    Q          Do you know how he knew that?

22    A          Because he was in the room when I got the

23    test done.

24    Q          And this was the testing that you had at
```

1    Suburban General?  Is this your barium test?

2    A        Yeah.

3    Q        And the only doctor you saw there for the

4    barium test was the radiologist, right?

5    A        I don't know.  It was a lady and a man there.

6    Q        Pardon?

7    A        It was a lady and a man.

8    Q        Okay.  You say in your complaint that Dr.

9    Smith was responsible for you being in the R.H.U.

10   A        I didn't say that.  That ain't in my

11   complaint.

12   Q        That is the amended complaint.

13   A        Oh, yeah, yeah.  Oh, the amended complaint?

14   Q        Yeah.

15   A        No, I didn't say that.

16   Q        Okay, so that's not part of your claim?

17   A        My lawyer, if my lawyer found out information

18   that I didn't find out, you got to talk to him about

19   that.

20   Q        Okay.  You have no basis to believe that he

21   put you in the R.H.U.?  Dr. Smith.

22   A        What do you mean I have no basis?  I can't

23   say that.

24   Q        Do you have reason to believe that he put you

1    **in the R.H.U.?  That a medical doctor can put you in**

2    **the R.H.U.?**

3    A        Do I have reason not to believe he didn't?

4    Q        **You don't know?**

5    A        Right.

6    Q        **Okay.  I have no further questions.  Thank**

7    **you very much.**

8                      MR. WRIGHT:  I have nothing further at

9    this time.

10                          *    *    *

11                      (Witness excused.)

12                          *    *    *

13                      (Whereupon, the deposition was

14                 concluded at 12:00 p.m.)

15                          *    *    *

1                          I N D E X

2

3                        *     *     *

4

5    WITNESS:   STRATTON NEAL PEAY

6

7    QUESTIONED BY:                               PAGE

8

9    Mr. Wright                                    3

10   Mr. Gold                                     71

11

12

13

14

15

16                    E X H I B I T S

17

18                        *     *     *

19

20   NUMBER              DESCRIPTION           MK'D.

21   P-1                 RADIOLOGY CONSULT REPORT    74

22

23

1

2

# C E R T I F I C A T I O N

3

4

5

6

I, Lisa M. Cooper, hereby certify the

7    foregoing is a true and correct transcript of

the proceedings held in this matter, as

8    transcribed from the stenographic notes taken

by me.

9

10

11    *Lisa M. Cooper*

------------------------------------------

12    LISA M. COOPER

COURT REPORTER and NOTARY PUBLIC

13

14

15

16

(This certification does not apply to

17    any reproduction of this transcript, unless

under the direct supervision of the

18    certifying reporter.)

1                          LAWYER'S NOTES

    PAGE    LINE
2   ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
3   ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
4   ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
5   ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
6   ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
7   ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
8   ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
9   ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
10  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
11  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
12  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
13  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
14  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
15  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
16  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
17  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
18  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
19  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
20  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
21  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
22  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
23  ----    ----    --------------------------------------------
    ----    ----    --------------------------------------------
24  ----    ----    --------------------------------------------

# Mercy Suburban Hospital

2701 DeKalb Pike • Norristown, PA 19401 • (610) 278-2100

## RADIOLOGY CONSULTATION REPORT

DP4246

| D.M. Bolden, D.O. (Chairman) | S.W. Thai, D.O. | M.J. Zappitelli, D.O. | B. Marks, D.O. | S. Wable, M.D. | A. Maidment, Ph.D. (Radiologic Physicist Consultant) |

Peay, Stratton OP

11873049    X 223047

Age: 25        DOB: 11/04/76

Graterford Correctional Institution

Att: Dr. Smith

P.O. Box 44

Graterford, PA 19426

Diagnostic Reports
RALPH SMITH, M.D.
MEDICAL DIRECTOR
Name:
Date / Time:
A            N        NCS

**REFERRING DIAGNOSIS/COMPLAINT:**        Pain

10/09/02

## BARIUM ENEMA

A survey film of the abdomen shows air throughout the colon with no definite distention or obstruction. An opaque density was noted adjacent to the head of the left femur which may represent a bullet fragment. With fluoroscopic control the colon canalized to the level of the cecum showing an extremely elongated tortuous and redundant sigmoid as well as redundancy with the hepatic and splenic flexure levels.

Reflux was noted in the distal ileum.

Double air contrast study shows satisfactory distensibility. The appendix was visualized and appeared tortuous containing fecal debris.

## CONCLUSION

1.    Extremely redundant and tortuous type colon showing no definite filling defects or obstruction or diverticula.

2.    Visualized appendix.

*Michael J. Zappitelli, D.O.*

MZ:hea

D/T: 10/09/02                    Michael Zappitelli, D.O.

EXHIBIT

P-1

LC 6-4-03

PERTINENT HISTORY IS IMPORTANT FOR OPTIMAL INTERPRETATION OF YOUR IMAGING REQUESTS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

STRATTON NEAL PEAY,                    :
                                                      CIVIL ACTION
           vs.                          :    NO. 02-2688

SUPERINTENDENT DONALD VAUGHN,
JULIE KNAUER, RALPH W. SMITH,          :
SGT. THOMAS and CORRECTIONAL
HEALTH CARE, INC.                       :

## VERIFICATION OF RALPH W. SMITH, M.D.

I Ralph W. Smith, M.D., being of full age, depose and state as follows:

1.    I am a medical doctor.

2.    In 2001 and 2002 I functioned as an employee of Prison Health Services, Inc. a

private corporation hired by the Department of Corrections to provide medical services to

inmates at the State Correctional Institution at Graterford (SCI Gratrford).

3.    Every time that Stratton Neal Peay told me that he needed medical care I

examined him and provided medical care to him.

4.    At no time did I deprive him of medical care

5.    At no time did I believe that he suffered from a serious condition that required

more care than I was providing.

6.    At no time did I believe that anything I did or did not do presented a substantial

      risk of harm to him.

7.    At no time did I believe I was violating his constitutional rights.

8.    At no time did I refuse to see him.

9.    At no time was I aware that he had been denied treatment or the guards were

preventing him from seeing me.

10.    The medical records of Peay from SCI Graterford are accurate as they relate to me and show that I provided treatment to him on numerous occasions.

11.    I ordered numerous tests all of which showed nothing wrong with his abdomen.

12.    Other doctors examined him at SCI Graterford.  Their findings were the same as mine.

I hereby certify that the above statements are true and correct to the best of my knowledge, information and belief.  I also understand that the statements contained herein are subject to the penalty of perjury pursuant to 28 U.S. §1746 relating to unsworn falsification to authorities.

RALPH W. SMITH, M.D.

DATE: _8-13-03_

UNREPORTED/NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 99-1971

———————

LARRY GEISLER,
Appellant

v.

STANLEY HOFFMAN, DR.;
DONALD T. VAUGHN

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge: The Honorable John R. Padova

———————

Argued: September 12, 2000

———————

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed: September 29, 2000 )

———————

MEMORANDUM OPINION OF THE COURT

———————

BARRY, <u>Circuit Judge</u>

Appellant Larry Geisler, a former prisoner at SCI-Graterford, appeals separate orders

of the District Court which granted motions to dismiss his civil rights action against appellees



Dr. Stanley Hoffman and Superintendent Donald T. Vaughn. The District Court dismissed Geisler's action against Dr. Hoffman for failure to exhaust administrative remedies and dismissed the action against Superintendent Vaughn on the merits.[1]  In this appeal, Geisler seeks reversal of the orders of dismissal and adds a constitutional challenge to 42 U.S.C. § 1997e(a), a challenge he did not raise before the District Court.[2]  For the reasons set forth below, we will affirm.

The facts underlying this case, as sympathetic as they are to Geisler, are well-known to the parties involved and will not be repeated here.  Despite that sympathetic story, however, we must follow the mandate of Congress in 42 U.S.C. § 1997e(a), as interpreted

---

[1]  Superintendent Vaughn argues that because Geisler's brief on appeal fails to address the merits of his claim against him, much less tell this Court why, in his opinion, the District Court erred in dismissing the action as to him, that order of dismissal is not properly before us for review.  We agree.  "An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before t[he] court." Laborers' Int'l Union of No. Am. v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) (quoting Simmons v. City of Philadelphia, 947 F.2d 1042, 1066 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992)); see also Penn. Dept. of Public Welfare v. U.S. Dept. of Health and Human Services, 101 F.3d 939, 944 (3d Cir. 1996).  The remainder of this opinion will, therefore, address only Geisler's appeal from the dismissal of Dr. Hoffman and we will affirm as to Superintendent Vaughn without further discussion.

[2]  We have consistently refused to consider issues that are raised for the first time on appeal.  See Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994); Richerson v. Jones, 572 F.2d 89, 97 (3d Cir. 1978) (noting that "refusing to consider on appeal an issue or argument not raised below normally promotes the finality of judgments and conserves judicial resources").  While there is a "manifest injustice" exception to this Court's rule against consideration of new legal issues on appeal, this rarely-applied exception is not triggered here.  We, therefore, will not consider Geisler's challenge to § 1997e(a).

2

and arranged to have an inmate file a second grievance on his behalf, he admittedly never went beyond that initial step within the formal appeals process outlined in DC-ADM 804. Moreover, the failure of the prison officials to formally respond in writing to these grievances did not, contrary to Geisler's argument, relieve him of the obligation of exhausting the requisite administrative remedies. DC-ADM 804 does not prohibit prisoners from appealing the failure of prison officials to act on initial grievances and, therefore, Geisler was statutorily constrained to bring his grievances to the next level within the prison grievance scheme before pursuing relief in the judicial forum.  And, we note, Geisler's grievances sought relief wholly different from the monetary remedy that he subsequently sought from the District Court.  To this end, even if Geisler had brought his grievances before the two appellate tiers provided for by DC-ADM 804, exhaustion in that setting clearly would not have exhausted his current claim for monetary relief, a claim which he never even began to pursue administratively.

In this connection, Geisler cannot be heard to argue that seeking monetary damages in the administrative setting would have been "futile."  First of all, DC-ADM 804 made awards of monetary relief available to inmates as of May 1, 1998 – well before Geisler filed his federal complaint in July 26, 1999; if the very relief Geisler sought in the judicial forum was first available to him in the administrative forum, a grievance in that forum could not have been "futile." Second, even if administrative remedies had not been available to Geisler via DC-ADM 804, any attempt to invoke a "futility" exception would be denied in light of

4

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 99-1971

———————

LARRY GEISLER,
Appellant

v.

STANLEY HOFFMAN, DR.;
DONALD T. VAUGHN

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge:  The Honorable John R. Padova

———————

Argued: September 12, 2000

———————

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed: September 29, 2000 )

———————

JUDGMENT

———————

This cause came to be heard on the record from the United States District Court for

the Eastern District of Pennsylvania and was argued on September 12, 2000.

After consideration of all contentions raised by the appellant, it is

ADJUDGED and ORDERED that the judgments of the District Court be and are hereby affirmed.

Costs taxed against appellant.

_Marcia M. Waldron_

Marcia M. Waldron, Clerk

Dated: September 29, 2000